SILAS GALLIHER v. STATE.

No. A-8836.   March 1, 1935.
(42 Pac. [2d] 148.)

Stevens & Cline, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DOYLE, J.   Upon information, in substance, charging that in Comanche county on the 30th day  of April,

1933, Silas Galliher did shoot and kill one George Bell with a pistol, defendant was tried and convicted of manslaughter in the first degree; the jury by their verdict fixing his punishment at imprisonment in the penitentiary for a term of six years. Motion for a new trial was duly filed and overruled, and, from the judgment pronounced in pursuance of the verdict, he appeals.

The following statement of the undisputed facts which we quote from the briefs will answer the purpose of our consideration of the appeal:

"The defendant Galliher and George Bell, the deceased, were both farmers and lived about nine miles southeast of Lawton. The defendant was a bachelor about 52 years of age, living by himself, excepting a hired hand who was absent the day of the tragedy. The deceased was a married man whose home was about a mile and a half south and east from where the defendant lived.

"On Sunday morning, April 30, 1933, George Bell visited the defendant, walking there from his home. A little later another neighbor, Grady Ray, visited the defendant. Both waited around defendant's place until he had put away the morning's milk and washed the breakfast dishes, and then they all went into the defendant's bedroom and played pitch for pastime. The defendant had been making some whisky and had stored three kegs in an upstairs room and also had two half-gallon fruit jars nearly full of whisky downstairs. They all took a drink before starting to play cards. Along about the middle of the forenoon Mary Bell, a daughter of the deceased, and a young lady school teacher called there to talk to the deceased, who was one of the trustees, about teaching school in that district. While these parties were there, Mr. Ray left and returned to his home which was about one-quarter of a mile south of the defendant's home. After the young ladies had left, two other farmers in that community, Letch Hoskins and George Coley, visited the defendant, and while they were there the parties played

a few games of pitch, but did not drink any liquor at that time. After Hoskins and Coley left, the defendant and the deceased continued to drink whisky.

"Between five and six o'clock that evening the defendant was seen near the home of Arthur Wolfe, who lived about 200 yards west and a little south of the defendant's place. At that time, the defendant was bareheaded and was carrying a light-handled pistol in his hand. Mr. Wolfe and his son, Orland Wolfe, were returning to their home about that time in the evening and passing the defendant noticed that he was carrying a pistol in his hand and appeared to be under the influence of intoxicating liquor. Later Mr. Wolfe's boy while driving in the milk cows along the road by the defendant's house noticed the defendant lying on the porch and told his father about it. About that time Grady Ray, driving his cows home by Mr. Wolfe's house, stopped and Mr. Ray and Mr. Wolfe went over to the defendant's house to see if anything was the matter with him. They talked with the defendant at that time and he seemed to be all right. These parties then went home. A very short time thereafter the defendant was seen on the public highway south of his home going in the direction of Grady Ray's home. He was bareheaded and barefooted. He was overtaken by some parties riding in a Pontiac sedan. There were five young people in the car, among whom was Mary Bell, the daughter of the deceased. The defendant stopped the car and asked them to take him on to Ray's house, which they did. When they stopped at Mr. Ray's house, the defendant asked Mr. Ray to go back to his house with him and he told Mr. Ray that the reason he wanted him to go was that there was a dead man in his house. Mr. Ray and the defendant got on the running board on either side of the automobile, in which the defendant had been taken to Mr. Ray's and they all returned to the defendant's house. On the way back, Mr. Ray asked the defendant who the dead man was, and the defendant said he didn't know. When Mr. Ray inquired about George Bell and how long he had stayed there at the house, the defendant answered that Mr. Bell didn't stay long. When these parties arrived at the de-

fendant's house they found the dead man on the floor of the room where they had been playing cards. The dead man was George Bell. He had been shot through the body from the front to the back, the point of entrance being three or four inches higher than the point of exit.

"The physical surroundings showed that two bullets had been fired from a 38-calibre pistol, one of which passed through the body of the deceased and lodged in the wall of the room, and the other had evidently been fired into the ceiling.

"Charles F. McCarty testified that he was sheriff of the county and on the 30th day of April he went to the Galliher place and saw the defendant and the body of George Bell. Mr. Bell's face indicated that he had been hit in the face, his lip was cut. At first, it looked to him like finger marks. He found a gun on a table in the kitchen; it was a Texas Ranger 38-Colts; two shells had been fired and the empties remained in the gun. The defendant said it was his gun but that he didn't know Bell had been shot and killed; that he knew nothing about it. He further stated that he had got drunk and after cooking lunch he went out and laid on the porch and did not remember anything until he got up and found the body. Witness saw a fruit jar with some whisky in it on the kitchen table and later went upstairs and found a couple of kegs of whisky there.

"On cross-examination witness said the defendant stated that he and Bell had been drinking, and the last he remembered doing was going out on the east porch and lying down; that he did not know who shot Bell. Witness further stated that he found a bullet hole near the center of the ceiling of the room where the body was found; another bullet hole was found in the north wall, about 4 feet from the floor. The bullet had passed through the plaster after having apparently coursed through the body of Mr. Bell.

"As a witness in his own behalf, the defendant testified that he had lived in the community where he now re-

sides since 1907, and lived near Mr. Bell whom he had known for 27 years; that they had always been good friends and neighbors, and they had never had any trouble of any kind.

"Defendant further testified that Slim Swanson was a young man who came to his house about 18 months previous to pick cotton, and after cotton-picking was over he asked to stay a while and would help defendant on the farm without wages; that they were in Lawton Saturday and Swanson did not come home that night. The next morning Mr. Ray came over with Mr. Bell and they joked him about not having his dishes washed yet; that there was a jar with some whisky on the table and they all took a drink, then they played pitch; that it was customary for neighbors to come there to play pitch, usually on rainy days, Saturday nights and Sundays, but he did not permit gambling in his house and there wasn't any gambling on the Sunday in question; that he had never sold any liquor in his life; that they had played three games when Miss Mary Bell and the other lady came and talked to Mr. Bell about the school. When the ladies came, Grady Ray went home. Later Hoskins and Coley came along the road and he hollered to them and they came in, played two games and left. Before they came in Mr. Bell hid the whisky in the pantry; that he started to fix dinner and Mr. Bell continued drinking. Witness became sick and went out on the back porch and laid down; Mr. Wolfe and Mr. Ray awakened him that evening; that shortly after they left, he got up and went into the house and saw Mr. Bell lying on the floor. He thought he was drunk and shook him by the shoulder and saw his face was cut. He walked around the body and then went after Grady Ray. They all came back with some young people, including Mary Bell. She took hold of her father and then asked witness, 'Why did you kill him?' and he told her he did not kill him; she wanted to know who did, and he told her he didn't know; she said, 'He has been shot,' and witness said he did not think so. Then she pulled the clothes back and showed where he had been shot, and later the sheriff came there and made an examination.

"That he usually kept the gun under the pillow of his bed; the sheriff had asked about the whisky and there were three kegs and a jar; that he had helped Swanson to make the whisky; that Swanson secured the paraphernalia with which to make it; that Swanson several times had proposed to him to make whisky and witness objected to it; that witness had a binder obligation and wanted to pay that, and Swanson figured to make some whisky to buy him some clothes and pay for my binder; that he had never sold any whisky; that Mr. Bell knew nothing at all about the whisky being made or being kept there. It had been stored upstairs in the west room; that he did not kill George Bell or have knowledge of who did.

"A number of witnesses testified that they had known the defendant for several years and were acquainted with his general reputation as to being a quiet, peaceable and law-abiding citizen in the community where he lived, and that his previous reputation was good."

It is contended that the trial court erred in refusing to give an instruction on the law of self-defense. Counsel in their brief say:

"That even where a defendant denies the killing or any recollection of a killing, the jury should be charged to consider all the facts and circumstances related in evidence, surrounding the homicide, and if the condition and situation of the house and the contents thereof, the mute evidence of the tragedy, are sufficient to convince the jury that the defendant actually shot the deceased, but was acting in his necessary self-defense of his person, or to prevent great bodily harm to himself, either actual or reasonably apparent, they should consider the law of self-defense as stated in the instruction, and as such requested instruction set forth such law of self-defense as: that one being at a place where he had a lawful right to be, and is assaulted by another in such manner as to cause the defendant, viewed from his standpoint at the time, to believe upon reasonable grounds that the deceased was about to commit some grave personal injury upon the defendant, and from

his standpoint that there was imminent danger of the design being accomplished, the defendant could resist such attack and protect himself therefrom, even to the point of taking the life of his assailant, if necessary, and such killing would be in self-defense, and not punishable."

Citing the case of State v. Jackett, 81 Kan. 168, 105 Pac. 689, 19 Ann. Cas. 118, the holding of the Kansas Supreme Court is that:

"Where there is substantial evidence tending to show that the accused acted in self-defense, the fact that he denies having committed the act which caused the death is not necessarily a ground for refusing to submit to the jury the question whether the killing was justifiable."

The distinction between that and the instant case is, that the evidence showed that, if Jackett fired the fatal shot, he did so in defense of his habitation and of his person, and that on being arrested Jackett admitted that he had probably fired the fatal shot; however, as a witness in his own behalf he denied having done the shooting.

Whether it is the duty of the trial court in a prosecution for homicide to instruct the jury on the question of self-defense when the defendant denies the killing seems to depend entirely upon the nature of the evidence introduced at the trial. If the defendant denies the killing, and there is no evidence adduced by either party which tends to show that the killing might have been in self-defense, although other evidence shows quite conclusively that the defendant committed the crime, it is not the duty of the court to instruct as to self-defense; but, where there is substantial evidence tending to show that the defendant acted in self-defense, the court should instruct the jury upon the law of self-defense, notwithstanding the defendant's testimony that he did not do the act from which death resulted.

It appears that the defendant at all times denied that he did the shooting resulting in the death of Bell, and all the circumstances surrounding the killing, and the physical facts prove conclusively that Bell was shot and killed with the defendant's pistol, and that the defendant was the only person present when the fatal shot was fired.

They had been friends and neighbors for more than 25 years, and had never had a previous difficulty, and there was no pretense or claim that the shooting was done in self-defense other than indicated by the instructions requested. It follows that the trial court's refusal to instruct on the law of self-defense was not error.

It is also contended that the court erred in the instructions to the jury by giving instructions Nos. 8 and 11,

Instruction No. 8 instructs the jury as to the issues in the case, and, considered in connection with the other instructions given, is as favorable to the defendant as he had any right to demand.

Instruction No. 11 concludes as follows:

"Or if you entertain a reasonable doubt, as to whether or not the defendant at the time he killed the deceased, if you find beyond a reasonable doubt that he did kill the deceased, was intoxicated to such an extent that he was not able to form within his mind the criminal design to effect the death of the deceased, it would be your duty to resolve such doubt in favor of the defendant and find him guilty of the crime of manslaughter in the first degree."

"Excepted to by the defendant and exceptions allowed. Eugene Rice, District Judge."

Under our Penal Code, Okla. Stats. 1931, § 2216, first subdivision, homicide is murder: "When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other hu-

man being," and evidence of intoxication is admissible to show an absence of the premeditated design to kill, for the purpose of determining whether the offense was murder or manslaughter, and a state of intoxication which will reduce homicide from murder to manslaughter in the first degree must be of such character and extent as to render the defendant incapable of entertaining or forming a design to effect death, and the question is for the jury to determine.

See Cheadle v. State, 11 Okla. Cr. 566, 149 Pac. 919, L. R. A. 1915E, 1031; Choate v. State, 19 Okla. Cr. 169, 197 Pac. 1060.

Intoxication, either voluntary or involuntary, is to be considered by the jury in a prosecution of murder in which a premeditated design to effect death is essential, with reference to its effect upon the ability of the defendant at the time to form and entertain such a design, not because, per se, it either excuses or mitigates the crime, but because, in connection with other facts, an absence of malice or premeditation may appear.

A person who commits a homicide while so drunk as to be incapable of forming a premeditated design to kill, if he had formed no purpose to commit the crime prior to the time he became so intoxicated, is not guilty of murder, but is guilty of manslaughter in the first degree. Cheadle v. State, supra.

The contention of counsel for the defendant is that instruction No. 11 is erroneous, in that the phrase "criminal design" is used instead of the words "premeditated design."

The instructions given by the court, considered as a whole, fairly and fully presented the law as to the two

440

degrees of the offense charged, the same being murder and manslaughter in the first degree, and the use of the word "criminal" instead of "premeditated" did not render the instruction more burdensome to the defendant; the error, if any, was in favor of, and not against the defendant.

The indulgence which the law shows to cases of manslaughter is to the weakness of human nature, not to its wickedness. As to the character of this homicide, there can be but little doubt.

On the facts, which are undisputed, the defendant is guilty at least of manslaughter in the first degree.

Upon a careful examination of the record, we are satisfied that no exception taken by the defendant upon the trial is of any force, although it appears that the defendant was there, as he is here on the appeal, exceptionally well represented. It follows that the judgment rendered upon the verdict must be, and the same is hereby, affirmed.

DAVENPORT, P. J., and EDWARDS, J., concur.