## CLEO QUICK v. STATE.

No. A-9075.   Dec. 5, 1936.
(62 Pac. [2d] 1279.)

Samuel G. Whitaker and S. H. Singleton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter referred to as the defendant, was convicted of murder and his punishment fixed at imprisonment in the state penitentiary at hard labor for life. Motion for new trial was filed, considered, overruled, exceptions saved, and the defendant has appealed.

The testimony on behalf of the state in substance is as follows: Mrs. Maggie Gibbs, the wife of the deceased, stated:

"I came to Duncan with my husband and three sons; my husband left us to go to a barber shop on the east side of the railroad. The next time I saw him he was in the hospital, unconscious and gasping for breath. He was 55 years of age."

Dewey Bowden stated:

"On the 14th day of September, 1935, I was in a little cafe about 12:30 or 1 o'clock in the afternoon operated by Mrs. Pearl Mullins, on the east side of the railroad tracks, and north of the barber shop. When I went in the cafe Mr. Gibbs was eating a dish of chilli; shortly after I went in Cleo Quick came in and stated he was hungry, and I invited him to have my bowl of chilli; Quick was talking in a loud and boisterous voice and had the appearance of having been drinking considerably. Mrs. Mullins asked him to be quiet and not talk quite so loud; he took a bottle of whisky out of his pocket and set it on the table and asked the boys if they were mad at him and received the reply that they were not. Mr. Gibbs in substance stated, 'let's be quiet and respect the place.' The defendant replied to the request of Mrs. Mullins or Mr. Gibbs that he thought as much of Mrs. Mullins as he did of his sister. When Mr. Gibbs finished eating the defendant got up facing Mr. Gibbs and hit Mr. Gibbs three times

in the face, the third time he struck him Mr. Gibbs fell out of the door, the back of his head striking the concrete walk; the door he fell out of was several inches higher than the sidewalk; the defendant went out and picked Mr. Gibbs up and put him back in the cafe on the floor. Mrs. Mullins rushed out to call the officers; one of the boys went to the hatchery and got a bucket of water, and some one bathed Mr. Gibbs' face with water; by this time there was blood on the floor near Mr. Gibb's face and hands."

Roy Kerns testified on behalf of the state, and stated that:

"On the 14th of September, 1935, I was in the cafe in which W. D. Gibbs was killed; this cafe was operated by Mrs. Pearl Mullins. I had never met Mr. Gibbs but had known the defendant for approximately 18 months; I saw the fight."

The testimony of Kerns is in substance the same as the testimony of Dewey Bowden, Kerns detailing the conversation that took place in the cafe.

Mrs. Mullins, in substance, stated that:

"The deceased, Mr. Gibbs, came to the cafe about 12 or 12:30, and ordered a dish of chilli and paid for it in advance, and was sitting on a stool eating when defendant came into the cafe using loud and hard language; I requested him once, and the deceased asked him to calm down and not to flash the whisky in my place of business as we might all get arrested. Mr. Gibbs, the deceased, was very orderly and joined me in a mild suggestion to the defendant that we all be quiet and respect the lady's place of business as she was a friend of his. The defendant in substance replied that he thought as much of Mrs. Mullins as he did of his sister. Mr. Gibbs got up from where he was sitting and started to leave, and the defendant hit him three times about the face and head; when he struck the deceased the third time the

deceased fell out of the door to the sidewalk; this sidewalk is about 18 inches below the door; some of the boys had gone for a bucket of water, and I went to the hatchery and called the officers. When I came back the defendant had deceased back on the floor in the cafe, and was standing over him with his foot raised in a position as though he had stomped the deceased; there was blood on the floor near the deceased and also on the stool."

Slim Barnes, called as a witness, stated:

"I was about three or four steps from the cafe and saw the defendant beating the deceased, while the deceased was down on the floor; this was while the other two boys and Mrs. Mullins was out of the cafe; I called to the defendant and begged him not to do that any more, and he angrily said in substance that if I wanted some of it to come on in; I heard dull thuds before I could see the parties that sounded to me like some one stomping on a body; it sounded to me just like the dull thuds I had heard when I saw a man at a carnival stomped."

Mrs. Jim Bradley, testifying for the state, said:

"I was near the cafe when the deceased fell out of the door and heard the commotion; my husband had gone to the hatchery to buy some feed, and when he came out he got in the car. The defendant came by and asked my husband if we were officers, and if we wanted to see him."

J. M. Bradley stated he was working for the Duncan Banner, and had gone to the hatchery to buy some feed:

"After the defendant asked me and my wife if we were officers, and I told him we were not, he turned around and went back toward the cafe door. A fellow with a crippled arm ran up and told him he had better go away; the police were coming. The defendant replied, 'I don't care if they all come, I can whip them,' and turned around and went into the building. I could see in the building from where I was sitting, through the windows; as he started into the building I stepped on my starter, and as I glanced in the window I saw some

one was stomping somebody in there. I could see quite a distance down the body but could not see his feet; I could not see the body on the floor; it looked to me like he jumped up and down on the man three or four times. By this time I started backing out the car."

The undertaker said the eyes, lips and back of the head of the deceased were badly beaten and swollen, and he had a bad cut on one eye. The physician who treated the deceased at the hospital stated one cut on the eye required four stitches; the back of the head was badly bruised. The cause of the death of the deceased was a hemorrhage of the brain, and that any or all of the licks on the back of the head, as indicated by the bruises, could have caused the hemorrhage. The deceased died about 5:45 p. m., on the 14th of September, 1935, the same day the defendant assaulted and beat him.

C. M. Mullins, the chief of police of Duncan, testified he went to the cafe and found the deceased on the floor of the cafe unconscious; "I afterwards found the defendant on the street and arrested him and took him to the jail; he was drunk at the time I placed him under arrest."

Roy Waldrip stated:

"I took the defendant from the city jail to the county jail; as we got to the top of the stairs he said, 'if that s——of——b is over there I am going to finish him up'; I turned him over to O. W. Lawson, the jailor."

O. W. Lawson stated Waldrip came to the top of the stairs with the defendant; "Defendant was saying something about some one but I did not hear any name; I opened the cell and told him to go on in and he began to get rough, and said 'g— damn you,' and I hit him with the keys; I then took him to what is known as the little cell and left him there."

The foregoing is the substance of the state's testimony.

The defendant, testifying in his own behalf, stated:

"I live 11 miles east of town; on the 14th of September, 1935, I came to Duncan to cash a check; I indorsed the name of my father, by me, and cashed the check and bought a pair of overalls, and a half pint of whisky and drank it; this was about 9:30 or 10 o'clock. I later bought a pint of whisky, and a boy and I drove the truck outside the city limits to drink it; we went about a mile east; I took a couple of drinks and from that time on I do not remember anything that took place until I was up in jail. I do not know when I came to the jail; I have no recollection of anything that occurred at the restaurant; I am 19 years old.

"I did not know Mr. Gibbs, the deceased, had never seen him as far as I know; whatever I did it was unknowingly. I plead guilty once to a charge of forgery and served a term in the Reformatory at Granite. Since I served my time at Granite I have been working as a farm hand, and at different things; have only lost about ten days since the 19th day of June; do not remember being in the cafe run by Mrs. Pearl Mullins, nor do I remember seeing any one at the cafe, or any other place, after I drank the whisky out on the highway until I woke up and found I was in jail; from the time I drank the whisky on the country road until I woke up in jail I have no recollection whatever of where I was or what I did."

The defendant in his assignment of errors alleges that in the trial of his case there were 13 errors committed by the trial court.

The defendant discusses first his sixth assignment, which is as follows:

"Said court erred in refusing to reduce the charge from murder to manslaughter, for the reason there is no evidence in the record to support the charge of murder."

The defendant in this case was prosecuted for murder. As defined in section 2216, O. S. 1931, which defines homicide to be murder in the following cases:

"First. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.

"Second. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"Third. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

It is urged by the defendant that he was drunk at the time he committed the act; that he never knew the deceased before and therefore he could not possibly have a, premeditated design to effect the death of the deceased. It is further urged that he was so drunk he did not know what he was doing, and that his actions while in such a condition are not a fair criterion to test whether or not the defendant had a depraved mind, and therefore brings the act within the definition of the statute.

It is further urged by the defendant that he committed the act while committing a breach of peace, and that a breach of peace is a misdemeanor and not a felony, and as the defendant was not engaged in the commission of a felony when he perpetrated the act for which he was tried, the act cannot be classified as murder as defined by the statute, and if guilty at all he would not be guilty of anything other than manslaughter in the first degree. Citing Cheadle v. State, 11 Okla. Cr. 566, 149 Pac. 919, 920, L.R.A. 1915E, 1031, in which this court stated:

"A person who commits a homicide while so drunk as to be incapable of forming a premeditated design to kill, if he had formed no purpose to commit the crime prior to the time he became so intoxicated, is not guilty of murder, but is guilty of manslaughter in the first degree."

In this case the defendant died from the effects of blows inflicted upon him by the defendant, as shown by the testimony, the defendant striking the deceased three times, the last time the deceased fell backwards out of the door of the cafe, and his head struck the concrete sidewalk 18 inches below where you stepped out of the door of the cafe, and by stomping the deceased after he was down on the floor of the cafe.

The defendant directs the court's attention to Beshirs v. State, 12 Okla. Cr. 605, 166 P. 73, 74, in which the court stated:

"The weapon used in the killing was not a deadly one, and where the weapon so used in killing a person is not one likely to kill, the killing is manslaughter, unless there was an actual intent and premeditated design to effect death."

The defendant further presenting his argument on the question of the defendant's intoxication, insisted that the testimony in his case is sufficient to show that the defendant was in such a state of intoxication as to not know what he was doing, and that by reason of his intoxicated condition the crime charged against him could not be murder, but would be manslaughter in the first degree. Citing vol. 29 C. J. p. 1122, paragraph 110, in which it is stated:

"Manslaughter as defined at common law and under statutes simply declaratory thereof consists in the unlawful killing of another without malice, either express or

implied. It is distinguished from murder by the absence of malice, and from non-felonious homicide by the absence of circumstances excusing or justifying the killing."

In Galliher v. State, 56 Okla. Cr. 430, 42 Pac. (2d) 148, in the first paragraph of the syllabus the court said:

"Intoxication, either voluntary or involuntary is to be considered by the jury, in a prosecution for murder in which a premeditated design to effect death is essential, with reference to its effect upon the ability of the defendant at the time to form and entertain such a design, not because, per se, it either excuses or mitigates the crime, but because, in connection with other facts, an absence of malice or premeditation may appear, and a state of intoxication which will reduce homicide from murder to manslaughter in the first degree must be of such character and extent as to render the defendant incapable of entertaining or forming a design to effect death; and the question is for the jury to determine."

It is not disputed by the state, and the weight of authorities hold that intoxication, either voluntary or involuntary, is to be considered by the jury in a prosecution for murder in which a premeditated design to effect death is essential, with reference to its effect upon the ability of the defendant at the time to form and entertain such a design, not because, per se, it either excuses or mitigates the crime, but because, in connection with other facts, the absence of malice or premeditation may appear.

The defendant insists that the court's instructions 12 and 13 are erroneous; that No. 12 is ambiguous and confusing, and prejudicial to the rights of the defendant in that it does not give to the jury any clear statement of the law upon which the jury could find a verdict. Instruction 12 complained of by the defendant is as follows:

"You are instructed, gentlemen, if you believe that at the time of the alleged commission of the act with which

the defendant is charged, and for which he is now on trial before you, he was so intoxicated or temporarily insane from the recent use of intoxicating liquors as to render him incapable of forming a premeditated design to take the life of the deceased and entertaining malice, then you are charged that it could afford no excuse for the commission of the act charged against him, if the act was otherwise criminal, but such intoxication or temporary insanity, produced by the voluntary recent use of intoxicating spirits, and in that case should you find the defendant guilty of the offense charged against him, then your verdict should be manslaughter in the first degree."

The defendant also complains of instruction 13, which is as follows:

"You are instructed that should you find and believe from the evidence, facts and circumstances in evidence, in this case, beyond a reasonable doubt, that in Stephens county, state of Oklahoma, the defendant Cleo Quick, did feloniously, without authority of law, and with premeditated design to effect the death of one W. D. Gibbs, on the 14th day of September, 1935, with his fist and feet, beat, strike and stomp the body of the said W. D. Gibbs, in the manner and form as charged in the information herein, inflicted upon the body of the said W. D. Gibbs, certain mortal wounds from which the said W. D. Gibbs, did die, you should then find the defendant guilty of murder and assess his punishment by death or by imprisonment in the state penitentiary, at hard labor, for life."

While instructions 12 and 13 cannot be classed as model instructions, yet this court believes that they sufficiently cover the law on the question of defendant's being intoxicated at the time of the commission of the alleged offense, and that the instructions were such as to advise the jury upon the law applicable to the facts in the case.

It is further argued by the defendant that instruction 13 improperly instructed the jury by telling it that it

should find the defendant guilty of murder if it should find that the defendant stomped the face and body of the deceased with his feet, the defendant insisting that there is no testimony tending to prove any stomping on the face or body of the deceased.

Slim Barnes in his testimony stated he was passing by the building in which the trouble occurred and saw Mr. Gibbs' body and that the defendant was standing bent over Gibbs; that he heard a couple of licks prior to the time I got to the door; "I asked the defendant not to do that any more, and he replied, 'If you want some of it come on in.' I did not go in. The licks I heard before I got to where I could see were just dull thud sounds."

On cross-examination witness stated, "it sounded like blows on the flesh." Questioned by Mr. Singleton he answered:

"Q. Mr. Barnes, did you ever remember hearing a blow like that? A. Yes, sir. Q. What occurred when you heard them? A. You mean, have I ever heard anything like that. I saw a man stomped at the Carnival that sounded like a dull thug, thug, thug."

J. M. Bradley stated he was near the place where the difficulty occurred and had gone to the hatchery to get some feed; a lady came in and called the police; "when I came back to my car there was some commotion going on in the restaurant, a fellow came over to the side of the car and asked me if I was the police. Cleo Quick is the man that came to my car; he turned and went directly toward the cafe door and entered the building; just as I started my car I glanced through the windshield to the window and somebody was stomping some one in there; I could not see who it was on the floor; it looked like he struck three or four times; I could see the body of Quick distinctly through the west window."

The testimony is undisputed and is amply sufficient to show that not only did the defendant knock the deceased down three times but that the deceased fell out through the door to the pavement, which pavement is 18 inches below the door entrance and that the defendant carried him back in the house, then left the room, but returned and stomped and beat the deceased. While engaged in the stomping of the deceased, the witness Slim Barnes asked him not to do that any more, and he invited Slim to come in if he wanted any of it.

The defendant has cited a number of authorities and decisions of this court on the question that the verdict must be supported by the evidence. There is no dispute on the question that the verdict must be supported by the evidence, and if the record disclosed passion or prejudice on the part of the jury it would be an error, and the defendant would be entitled to a new trial. The authorities cited by the defendant state a correct proposition of law when the facts in the case are applicable, but the only trouble is the facts in this case are not the same facts as in the cases cited by the defendant.

There is no justification offered by the defendant, nor does the record disclose any action on the part of the deceased that would warrant the defendant in assaulting him. The only defense offered by the defendant is that he was so intoxicated that he did not recollect ever having been at the restaurant, or that he struck, stomped, beat, and bruised the deceased; he knew nothing that took place from the time he and another young man drove out of the city limits and took a drink of liquor.

It is clearly shown by the witnesses that the defendant was sufficiently sober when he came to the cafe, that he said he was hungry and one of the boys offered to

share his dish of chilli with him; that when he was requested by the lady running the restaurant, and the deceased, to not make so much noise and respect the place, he replied that he thought as much of Mrs. Mullins, the proprietress, as he did of his sister; that after he struck the deceased and carried him back into the restaurant, he was sober enough when Slim Barnes came and asked him not to hit the old man any more to invite Slim to come in, if he wanted some of what he was giving the deceased. The defendant then left the room and went to Mr. Bradley's car and asked if Mr. Bradley was an officer. Mr. Bradley saw him stomping some one, but could not see who it was because the body was on the floor out of Mr. Bradley's vision.

In Wadsworth v. State, 9 Okla. Cr. 84, 130 Pac. 808, this court in the fourth paragraph of the syllabus said:

"(a) Where a defendant voluntarily and willfully enters into a mutual combat in which he intentionally takes the life of his adversary, such killing will be none the less murder or manslaughter because the difficulty arose suddenly, or because the defendant may have been reduced to imminent peril during the progress of said difficulty.

"(b) It is the intention which prompts the act, and not the length of its duration which makes the unlawful killing of a human being criminal.

"(c) Every man is presumed in law to intend the natural and reasonable consequences of his acts, unless the circumstances raise a reasonable doubt as to what his intentions were.

"(d) Next to honor, human life is the most precious thing this side of heaven. No man with unhallowed hands can be permitted to intentionally break into the sacred house of life and shed its priceless stream and then come

clear upon the ground that he acted only upon a sudden impulse or difficulty.

"(e) The intentional taking of human life can only be justified by the mandate of the law or upon the ground of necessity, but this necessity must not be caused by the intentional fault or wrongdoing of him who attempts to plead it."

The testimony in this case is conclusive that the deceased met his death at the hands of the defendant without any justification or provocation by the deceased. The jury heard the testimony of the defendant and considered the same in connection with the testimony offered by the state, and after having done so, the jury was extremely liberal; it found the defendant guilty of murder and sentenced him to imprisonment for life. The defendant was fortunate that the jury, after finding him guilty, did not impose the death penalty.

We have considered all the questions raised and argued by the attorneys for the defendant, and the attorneys have ably presented all the defense the facts would warrant. There is no question that the evidence in this case is sufficient to sustain the verdict and judgment. The instructions of the court cover every phase of the homicide and are fair to the defendant.

From a careful reading and study of the record, and the instructions of the court, we conclude there are no errors in the record warranting a reversal.

The case is affirmed.

EDWARDS, P. J., and DOYLE, J., concur.