## VANCE J. LOWREY v. STATE.

No. A-10808.   Sept. 15, 1948.
(197 P. 2d 637.)

314

Miller & Miller, of Tahlequah, and Cobb, Hill, & Godfrey, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J.  Vance J. Lowrey, defendant below, was charged in the district court of Cherokee county with the murder of Juanita Butler on the 23rd day of January, 1946.  The case was first tried in May, 1946, which resulted in a hung jury.  The second trial was conducted in July, 1946, resulting in a conviction for the crime of manslaughter in the first degree.  Thereafter, the defendant Vance J. Lowrey was sentenced to the penitentiary for a term of 25 years.  From that judgment and sentence this appeal has been perfected.

Defendant contends that the evidence on the part of the state was insufficient, purely circumstantial, not con-

sistent with guilt nor inconsistent with innocence, that it does not exclude every reasonable hypothesis other than guilt, and specially that of accidental death, and that the court erred in not sustaining a demurrer thereto and not directing a verdict in favor of the defendant.. This contention requires a consideration of the pertinent evidence. The record discloses that both the defendant, Vance J. Lowrey, and the deceased Juanita Butler, at the time of the alleged crime, were residents of Tahlequah, Okla., and employees of the Indian Service. Defendant was employed as District Agent in charge of the Office of Indian Affairs. The deceased was employed as secretary. The district covered several counties and on occasions they covered the territory together in defendant's automobile. The record discloses that they were good friends, such good friends that according to defendant they had resorted to illicit cohabitation on occasions.

On the occasion herein involved the field service required the defendant and his associates, including the deceased, to make a trip to Sallisaw on January 23, 1946. The deceased Juanita Butler accompanied the defendant to Sallisaw in his automobile. It was on the return trip from Sallisaw back to Tahlequah that the death of Juanita Butler occurred. The record is clear that she was scheduled to return with Mr. Hahn. The record discloses that she declined to go to Stilwell to spend the night with Mrs. Damus Rhodes, Home Extension Agent. This she declined stating she was going to Tahlequah with Mr. Hahn. Mr. Hahn's business, however, took him to Vian instead, so the deceased returned to Tahlequah with the defendant. On the way over to Tahlequah they found a box of Kleenex in the road, a part of which they put in the glove compartment of the automobile. About 4 o'clock in the afternoon, when their duties at Sallisaw

were completed, defendant said his business required him to go to Moffett, just across from Fort Smith before making the return trip to Tahlequah. It discloses that they not only went to Moffet but went on to Fort Smith. Defendant testified that they went to Fort Smith to get the deceased some Schenley's whisky, but they could not find any in Fort Smith; that they window-shopped, but that they did not eat, though it was time for the evening meal. It further reveals that on the return trip defendant came by Stilwell, bought sandwiches, grapettes, and "cokes". From Stilwell he took a circuitous route home over a graveled road, detoured off the road to a dim-lit trail, and stopped by "the big tree". Defendant and the deceased were all alone. Here he says, at the suggestion of the deceased, the defendant produced an almost full one-fifth of rum (approximately a quart) and the soft drinks as a mixer. So they mixed drinks and drank apparently until all of the rum was consumed. These facts are undisputed. But hereafter, the agreement ceases. The defendant said he didn't have his hands on the deceased but maybe did have his arm around her. He said he didn't attempt to have relations with her. After they had eaten and drunk, the deceased wanted a Kleenex and with the aid of the dome light, reached in the glove compartment for the same. Instead of getting Kleenex, she pulled out a 32-caliber automatic, the defendant said he had carried for some time in the glove compartment. His mother said she had put the gun in the car, to get it out of reach of another son, who was mentally disturbed. The defendant said that when Juanita Butler pulled out the 32-automatic, the next thing he knew the gun was going off bang, bang, bang. Defendant said he started grabbing for it. It all occurred so fast he says he did not know what happened. To us this statement seems highly probable. But, after hav-

ing consumed his portion of the one-fifth gallon of rum, it is altogether probable that he was not able to comprehend what took place nor remember the details thereof. Moreover, this court will take judicial knowledge of the fact that people under the influence of liquor are easily incensed and angered, sometimes without provocation. This fact might well be applied to both the defendant and the deceased in considering the facts involved in this case. He says when the gun started going off he grabbed her by the arm, recovered it, put it in the glove compartment and said "Juanita, you shot a hole in the glass of my car," and she said "huh". This was evidence of the fact the defendant's powers of comprehension were below normal that he only saw one hole in the car, while it is the testimony of the sheriff that there were four holes in the car. He then asked Juanita if she was hurt and she didn't answer, and says he told her, if she didn't answer he would take her to the hospital. So he started driving to the hospital. If this story were true the defendant certainly would be entitled to an acquittal. But in considering it, it must be borne in mind that this was a studied story. No one would have any reason to doubt it, were it not for the things that transpired at the hospital and subsequent thereto.

The record shows at the hospital he contacted Dr. Hupp at his apartment and said "My secretary is out in the car and I believe she is dead". He further told Dr. Hupp "We were riding along and I spoke to her and she didn't answer. Then I shook her and she still didn't answer and I told her if she didn't answer, I was going to take her to the hospital". The doctor suggested to him that it was probably a heart attack and Lowrey replied "that is what I think". Doctor Hupp told Lowrey that he would be at the hospital in a few minutes

and take a look at her. At this time he says Lowrey did not appear to be under the influence of liquor. Shortly thereafter, Dr. Hupp removed the body from the automobile to the hospital examination room. Her appearance and pulse indicated to him that she was dead and he so told Lowrey. Dr. Hupp said he was compelled to go to the delivery room and deliver a baby. As soon as he got through he came back.

While in the delivery room he told Miss Donahue a friend of hers was in the dispensary and that she was dead. Miss Donahue went in and examined the body and came back and said she had blood on her coat and dress.

Dr. Hupp said he would have to examine her further. His examination disclosed a bullet hole ranging from the nipple on the left side and coming out on the mid-axillary line on the right side, on a line drawn vertically from the armpit downward, and intersecting with a line horizontally from the mid-line of the back. Dr. Hupp said the county attorney and the sheriff came in, and Lowrey sat down in a chair and explained about Juanita reaching in the glove compartment for cleansing tissue and finding the pistol, which he told her to put back, and which she put back, but at that time he did not say whether she had fired the gun. Dr. Hupp said that when they went to carry the body in, Lowrey did not call his attention to the hole in the glass, but on a second trip to the car, Lowrey called his attention to the hole in the glass and said, that when she shot the hole in the glass he turned and said "that is going to cost me a glass where that hole went through", and that she laughed and put the gun back. At this time he said there was just one shot fired, just one big bang. When the shot was fired he said they were driving along. Dr. Hupp said the day after Juanita

Butler's death he performed a Caesarean operation to determine whether or not she was pregnant, that this examination proved she was not. Dr. Hupp further testified that Miss Butler's clothing was dishevelled.

At this time the defendant did not undertake to fix the location of the killing. He said it occurred out near Chaffin's filling station on the road near Welling. This was later proven to be false and admitted to be false.

Miss Donahue, examining nurse, testified that Lowrey was going around the hospital with his pants unbuttoned when she saw him; that Lowrey told her Miss Butler died of a heart attack; but that when she examined Miss Butler she found blood on her clothes. She said Miss Butler's coat was on a chair when she came in to make her examination, that the coat had a bullet hole in the left breast on the right-hand side slightly in the back. (It thus appears that the coat was on her when she was shot.) The top part of the suit or jacket was on her, Miss Donahue said, and buttoned in the back. It did not have a bullet hole over the left breast, but only a hole in the back in the lower right side. Her slip on the left side had no hole in it, but in the back on the lower right side there was a bullet hole. The brassiere that goes on over the left breast as distinguished from the pad had no hole in it. The pad had a bullet hole in it. (This evidence is based upon the exhibits themselves.) It completely discredits defendant's story that he did not have his hands on her. It is evident that he had been playing with her left breast, she being on his right. Defendant in his then condition could not have been expected to be more considerate of her person than he was five times he swore he had adulterous relations with her. It is evident that after the deceased was killed he replaced her clothing. Miss Donahue said

she could smell liquor on Lowrey's breath. Miss Donahue further said that her examination showed Miss Butler was menstruating.

Miss Lola Cooper, another hospital employee, said she saw Lowrey's pants unbuttoned. This fact when considered in the light of a consideration of Miss Butler's clothes is almost conclusive as to what was going on out at the big tree, that they were both drunk and engaging in promiscuities, short of intercourse.

Sheriff W. T. Thorne deserves public commendation for his thoroughness in his investigation. He testified that he brought defendant to the hospital. He said defendant told him the shooting occurred near Chaffin's store as they rode along. That defendant told him the deceased took the gun out of the glove compartment and that he told her to put it back. He said the defendant said it went bang, and that he did not attempt to overpower her, and after the gun went bang she smiled and slumped over. The sheriff said the defendant had nothing further to say about the killing. The sheriff said they then went to the car, that he saw a hole in the glass and got the gun and gave it to Mr. Tehee, the county attorney; that he made a further examination of the automobile and found one empty shell on the left running board of the car. The sheriff said the next morning he examined the car more carefully, finding a "box of rubbers" under the dash, behind the cardboard. It is important to note here that the defendant testified on cross-examination that he bought those for home use. It is preposterous to believe that if such be the case it would be left in the car in such a hidden place. They could be of little use and inconveniently inaccessible that far removed from his bed. The sheriff said he found two bullets, one between the right cushion on the seat and the

right front door, and another in the sun visor on the left-hand side; the latter bullet had hit the frame of the car and lodged in the sun visor; the other bullet apparently had gone through her body and spent itself. The F. B. I. showed that both of these bullets were fired from a 32-automatic, and in addition to finding the two bullets he said he found four empty shells and counting the one he found the night before, making five in all. The sheriff said there were four holes in the car, one in the ventilator on the left-hand side. (No attempt was made under the record to locate the other three holes unless you consider the one in the visor.) The sheriff said at no time did Lowrey tell of them being in the "dim lit lane" near the big tree. The sheriff said he was not satisfied that the killing occurred as they rode along the highway as Lowrey said. He continued his investigation. Near the big tree he found the Ron Rico rum bottle at the site of the tragedy. Further investigation disclosed that this rum was not purchased in Sallisaw, as defendant had first testified, but that it was purchased at the Walgreen Drug Store for $4.33 their O. P. A. price, at their location at 422 Garrison Avenue, Fort Smith, Arkansas; that it was tied with a green string like Walgreen's used. At the site of the tragedy he found grapette bottles and a match-box from the "Deluxe Lunch Box" in Stilwell, where the defendant said they stopped and got the grapettes. The sheriff further said that about six feet up in the big tree he took out another 32-automatic bullet, which likewise is shown by the F. B. I. to have been fired from a 32-automatic. He further testified that that night Lowrey had a bad breath. He also said that the gun would fire only once at a time, and the trigger had to be pulled each time to make it fire.

Mr. Robert M. Zimmers, of the Federal Bureau of Investigation, testified that the gun would fire only one shot at a time, and the trigger had to be pulled to make it fire. He further testified that a comparable fire pattern on Miss Butler's coat showed the gun was held only about one inch from the deceased's coat at the time she was killed.

The defendant positively denied he killed Juanita Butler. On re-direct examination he said that at no time did he have the gun in his hands, but that he was trying to get it away from Miss Butler when she was killed.

The weakness of the defendant's defense lies in the inconsistency of his stories. At no time until he took the witness stand did he tell a straight-forward story, and, even then, his story is fraught with inconsistency. Moreover, the record in relation to specific instances of bad character and the defendant's denial of some of the material aspects of some of the instances, when contradicted by rebuttal proof, placed him in a bad light with the jury. No doubt the jury felt that he falsified in some things and he therefore should be believed in nothing. The strength of his case lies in the fact that the record discloses the direction of the shooting, as evidenced by the bullet that hit the frame and lodged in the sun visor on the left-hand side of the car, and the bullet that went through the left side of the ventilator, and the one found in the big tree were from the right to the left (the side on which the deceased sat, being to Lowrey's right), indicating that the deceased may have had possession of the pistol during some of the firing. It might even be concluded that she did start firing at random in a state of drunken irresponsibility, but there the strength from the defendant's standpoint ends. Thereafter, it appears he must have taken the gun away from her as he told

Dr. Hupp, and then remarked "see what you have done. You have cost me a window glass for this car". In an attempt to recover the pistol from Juanita Butler, we do not believe that any more logical conclusion can be drawn, than in trying to retain possession of the pistol and in wrestling with her physically superior adversary, that she would attempt to protect her possession with her body, putting her weight forward in a prone position, and the pistol being discharged to thus inflict the wound on her left breast, would pass through her body in the path it took and in the position where it came out. In no way, then, in that position could the bullet hole have extended from her left nipple down to her right side slightly to the back. We take little stock in the defendant's explanation that she shot herself while in a sitting position scuffling over the gun. We are inclined to believe that the position in which she was when she was shot was precipitated by natural instinct to go forward with the weight of the body to keep possession of the pistol, or keep her stronger adversary from shooting her. She could not have been killed by a ricochetting bullet for a comparable powder burn to that on the coat showed it was fired about one inch away from the coat. We are inclined to believe that the killing occurred in this manner. It may have been done intentionally in a fit of anger because of the damage to his automobile. It may have been done purely accidentally. In any event it was the result of a drinking bout and intoxication of both participants.

The defendant's position that the case is entirely circumstantial is erroneous. Here the state's case is circumstantial, while the defendant's case is dependent upon his own testimony. He alone was present at the killing of the victim. He alone knew what took place. He tes-

tified to what is supposed to be the facts, but because of the inconsistency of his stories as to his condition at the tragedy, his defense could be viewed as wholly unreliable. But we repeat, the case as far as the defendant is concerned is not circumstantial. It is based upon what the accused swears to positively. It is under this condition the defendant contends for the application of the following rule in Harris v. State, 39 Okla. Cr. 4, 262 P. 700, 701:

"Where the evidence is purely circumstantial, as in this case, the facts proven must be such as to exclude every reasonable hypothesis other than the guilt of the defendant of the offense charged in order to sustain the conviction. The evidence in this case does not meet this requirement."

Also, in Sies v. State, 6 Okla. Cr. 142, 117 P. 504, wherein the court held:

"Where the evidence is wholly circumstantial, and the facts and circumstances in evidence are of such a character as to fairly permit an inference consistent with innocence, it cannot be regarded as evidence sufficient to support a conviction.

"The facts and circumstances proved must not only be consistent with and point to the guilt of the defendant, but they must be inconsistent with his innocence."

See Dees v. State, 81 Okla. Cr. 48, 160 P. 2d 406, to the same effect. With reference to these time-honored rules, if the defendant's story is true, there is no need for applying them, and he should be exonerated. If it is false, then the circumstantial evidence is not consistent with innocence and may be viewed as excluding every reasonable hypothesis other than guilt. Therefore, the evidence is sufficient upon which the jury may have predicated a verdict of either innocence or of guilt. The

jury resolved the conflict against the defendant. Under such condition this court will not interfere with the jury's verdict, as we said in Sadler v. State, 84 Okla. Cr. 97, 179 P. 2d 479:

"Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, Criminal Court of Appeals will not interfere with verdict even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts."

This case presents a peculiar situation. The state's case is strong enough to convict; the defendant's case strong enough to acquit, if believed. It is apparent that the jury ignored the defendant's theory of the killing, applying the old Latin maxim "falsus in uno, falsus in omnibus". It was their right so to do under the state of the record.

When the case was first tried the defendant elected not to testify in his own behalf but to stand on the state's case. In this second trial, the defendant offered witnesses as to his good character and reputation as a good, peaceable and law-abiding citizen. In this connection the state inquired of said character witnesses if they had ever heard of certain specific acts committed by the defendant inconsistent with good character and reputation. To this cross-examination the defendant did not object, but concerning which he complains for the first time on appeal.

He contends that the court committed fundamental error prejudicial to his substantial rights in permitting the special prosecutor to prove reputation by these specific instances and acts. If this were true, his complaint

would not be too late. But an examination of the record and authorities will disclose this objection to be groundless. In this connection, Mr. J. H. Finley, who was offered as a witness by the defendant, on cross-examination testified as to the defendant being a good, peaceable and law-abiding citizen as follows, to wit:

"Q. Did you ever hear that when returning from business trips in a government car he would take his secretary and go out on side roads and park and drink liquor or things of that nature? A. No, sir; I haven't. Q. Did you ever hear he appeared in a drunken condition in the town of Fort Gibson and was arrested and put in jail and stayed overnight in jail? A. No, sir. Q. Or that he appeared at the Cox Hotel in Stillwell in a drunken condition? A. No, sir. Q. Did you ever hear he had been convicted of manslaughter in the second degree involving the death of a young woman at Norman, Oklahoma about 1927? A. No, sir; not until after this happened. Q. Did you ever have any idea that while using a government car he had gone to the town of Fort Smith, Ark., and bought a quart of liquor and carried it around in a government car? A. No, sir. Q. That would be against government regulations, wouldn't it? A. Yes sir."

Likewise defendant complains of the cross-examination of his character witness Mr. Hugh A. White as follows, to wit:

"Q. Did you ever hear that he appeared in the lobby of the Cox Hotel at Stilwell in a drunken condition and was insulting and abusive to the manager of the hotel, Mrs. Kilpatrick? A. No, sir. Q. Did you ever hear that while in a drunken condition he left his government car up at Baron and went away with the keys locked up in the car? A. No, sir. Q. Did you ever hear that he had appeared in the lobby of the Thompson Hotel in Tahlequah in a drunken condition? A. No, sir. Q. Did you ever hear that he was convicted of man-

slaughter in the second degree in 1927 involving the death of a young woman? A. No, sir. Q. Did you ever hear that he took his secretary out with him on trips and registered at hotels with her for the purpose of committing adultery? A. No, sir; I never heard that prior to this occurrence. Q. Did you have any idea that such was his conduct? A. I didn't have the slightest idea; no, sir. Q. If you had known those things to be true, would you still testify that his reputation was good? A. I can't answer that. You are asking me about my opinion about something that I don't know anything about. Mr. Bliss: All right; that's all."

Similarly, he complains of the cross-examination of witnesses John E. Martin, F. E. Perkins, Eugene Wheeler, Eldee Starr. To all of whom he contends the same or similar improper questions about specific offenses and acts were asked. It is pertinent to note in this connection defendant's complaint, as to evidence of specific acts being offered in rebuttal, carries little weight in view of the fact that in his own testimony and on cross-examination he readily admitted he had been drunk in Fort Gibson, but adroitly denied that he had spent the night in jail, contending that he had made a deal with the constable to pay a $12.50 fine. He swore that he had engaged in adulterous relations with the deceased five times; some of the times at the Severs Hotel in Muskogee, and two times at the place of the big tree, prior to but where the killing occurred. Furthermore, he admitted that he had pleaded guilty to manslaughter in the second degree and paid a fine of $750 for the death of a young woman at Norman, Okla., in 1927. All of this cross-examination was admissible, not only as evidence of character, but also admissible as going to credibility of the witnesses. Moreover, this court has repeatedly held that where defendant puts his character and reputation in issue, it is proper to ask the character witnesses offered by the

defendant on cross-examination if they have heard of specific acts or offenses derogatory of good character and reputation. In Gallagher v. State, 81 Okla. Cr. 15, 159 P. 2d 562, 566, this court said:

"In the cross-examination of a witness called to testify to the defendant's good reputation as a law-abiding citizen, it is permissible to ask the witness on cross-examination if he had heard of various specific acts of the defendant inconsistent with such reputation. Stouse v. State, 6 Okla. Cr. 415, 119 P. 271; Johnson v. State, 54 Okla. Cr. 143, 16 P. 2d 263; Bond v. State, 53 Okla. Cr. 224, 11 P. 2d 200; Carroll v. State, 24 Okla. Cr. 26, 215 P. 797.

"It is improper for the cross-examiner to inquire of a witness concerning alleged acts of the defendant which are creatures of the examiner's imagination and which did not occur, for the purpose of leaving the impression with the jury that his reputation is bad. The examiner should act in the utmost good faith and should be severely reprimanded by the trial court if found guilty of bad faith in his cross-examination of the witness along this line. The extent of such cross-examination is ordinarily a matter in the sound discretion of the trial court."

In Lyons v. State, 76 Okla. Cr. 41, 133 P. 2d 898, 900, this court said:

"When a defendant places his character in issue, the state has the right to thoroughly cross-examine him and the witnesses offered in his behalf. This right has often been upheld by this court. Long v. State, 61 Okla. Cr. 274, 67 P. 2d 980; Allen v. State, 72 Okla. Cr. 102, 113 P. 2d 835; Stouse v. State, 6 Okla. Cr. 415, 119 P. 271."

In the Lyons case the court said:

"It is permissible, on cross-examination of a witness who has testified to the good character of a defendant, to show the sources of his information, and particular

facts may be called to his attention, and he may be asked if he ever heard of them. This is permissible, not for the purpose of establishing the truth of such facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given to his testimony."

In Allen v. State, supra [72 Okla. Cr. 102, 113 P. 2d 837], in addition to what has hereinbefore been said, the court amplified the rule of cross-examination of the character witness as to specific offenses as follows:

" 'This is especially true as to offenses of the same character with which he stands charged. This is permissible, not for the purpose of establishing the truth of such facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given to his testimony.' "

It is well that we observe that all the particular facts referred to on cross-examination herein were of a similar nature to those involved in the case at bar. In Teel v. State, 53 Okla. Cr. 200, 11 P. 2d 197, 198, this court said:

"* * * The extent of such cross-examination is a matter resting in the sound discretion of the trial court, and a judgment of conviction will not be reversed because the trial court permitted such a cross-examination unless a clear abuse of such discretion is shown."

To the same effect is Bond v. State, 53 Okla. Cr. 224, 11 P. 2d 200. In Steyh v. State, 58 Okla. Cr. 258, 52 P. 2d 121, 122, this court further said:

"* * * However, such reports, to be admissible, must be confined to a time previous to the commission of the crime charged."

Thereafter the defendant testified in his own behalf and in so doing admitted, in substance, that he had committed the specific acts contradictory of good char-

acter and reputation, concerning which inquiry had been made of his character witnesses on cross-examination, but questioning the accuracy of the state's inquiries in some detail. Thereafter, in rebuttal the state offered proof concerning such specific acts. Upon the basis of these proceedings defendant alleges as an assignment of error that "the court erred in permitting incompetent, irrelevant and incompetent evidence to be given to the jury on behalf of the state, which is prejudicial to the substantial rights of the plaintiff in error * * *". In considering this assignment of error it should be borne in mind that the defendant himself offered witnesses as to his character and reputation as a good, peaceable and law-abiding citizen, that in so doing he thus put his character and reputation in issue. With his character and reputation in issue, he testified in his own behalf and on cross-examination was asked the following questions to which objection is made as erroneous:

"Q. On or about the 12th of December, 1945, I will ask you if it isn't true that you appeared on the streets of the town of Fort Gibson in a drunken condition and was arrested and spent the night in jail and plead guilty and paid a fine for being drunk?"

To this question defendant objected, the objection overruled and the following answer made:

"A. No, sir I was not arrested. I did pay the guy $12.50 and he let me go home and I did not stay overnight in jail in the town of Fort Gibson."

Thereafter, the state called Pete McLemore who testified concerning said incident as follows, to which the defendant objects as erroneous:

"Q. Where do you live, Mr. McLemore? A. Fort Gibson. Q. What official position do you hold there? A. Town marshal. Q. Did you hold such position on

the 14th of December, 1945? A. Yes, sir; I did. Q. Do you know the defendant, Vance Lowrey? A. I don't know him, but I have seen him. Q. You have seen him before? A. Yes, sir. Q. When did you see him? A. The night of December 14th. Q. What year? A. 1945. Q. You saw him on the night of December 14th, 1945? A. Yes, sir. Q. Where was he? A. In Fort Gibson. Q. Explain the circumstances under which you saw him and what occurred at that time? Mr. Miller: We object to him stating the details as to what occurred. The Court: Sustained, except he may state whether or not he was drunk. Mr. Miller: Note our exception. Q. State whether or not he was drunk? A. He was in a beer parlor there in town and was drunk. Q. Did you arrest him? The Court: That wouldn't be admissible. Objection sustained as to that. Mr. Bliss: That's all. Mr. Miller: Now if the court please, the testimony shows he was in a beer parlor there and if he was drunk then he may have got drunk on beer. There has been no testimony by this witness that he was drinking any liquor at all, and I therefore ask that the testimony of this witness be stricken and the jury admonished not to consider it. The Court: Overruled. Mr. Miller: Exception."

On cross-examination Pete McLemore testified as follows:

"Q. You say he was drunk? A. Yes, sir. Q. And when you started to arrest him, he paid you $12 and you released him and he got in his car and drove off? A. No, sir; I arrested him and put him in jail and he stayed in jail from about 9 o'clock until about 2:15 that morning and by that time he was sobered up and I released him. Q. But where you saw him was in a beer parlor? A. Yes, sir; in the Falstaff Beer Parlor. Q. And you say he was sober when you turned him loose? A. Yes, sir; what I thought was sober. Mr. Miller: That's all. I renew my objection to the testimony of this witness as being incompetent, irrelevant and immaterial and ask that the same be stricken and the jury admonished not

to consider it. The Court: Overruled. Mr. Miller: Exception. Mr. Bliss: That's all."

In this same regard the defendant further complains that on cross-examination he was asked the following question, to wit: "Q. I will ask you if some time subsequent to the 28th day of November, 1945, if you appeared in the Cox Hotel in the town of Stilwell in a drunken condition and were highly abusive to Mrs. Kilpatrick, the manager?" To which objection was made, the objection overruled, and the following answer made: "A. No, sir, I was not. I went in to see if Mr. White had a room that night—" Thereafter, the state called Mrs. Kilpatrick in rebuttal who testified as follows, to wit:

"Q. You are the same Mrs. Kilpatrick who testified before in this case? A. Yes, sir. Q. Yesterday? A. Yes, sir. Q. And you are the manager of the Cox Hotel in the town of Stilwell? A. Yes, sir. Q. I will ask you if you were such manager on the 28th day of November, 1945? A. Yes, sir. Q. I will ask you if sometime on or about that date you saw the defendant, Vance Lowrey, in the lobby of the Cox Hotel? A. Yes, sir. Q. State to the jury what his condition was with reference to being drunk or sober? A. He was drunk."

Moreover, on cross-examination the defendant complains he was asked and answered the following question:

"Q. I will ask you if you were convicted of manslaughter in the second degree about 1927 at Norman, Okla., involving the death of a young woman? A. I had an automobile wreck in which the young lady died and as a result thereof I was convicted of manslaughter in the second degree and was fined $750 and was later pardoned by the Governor."

Defendant contends that it was improper for the state to subject him to this type of cross-examination.

Such contention is wholly without merit. The defendant himself put his character and reputation in issue. He must subject himself to the detriment as well as the benefit thereof. The record discloses that his character witnesses said they had not heard of the instances concerning which they themselves were cross-examined and concerning which he himself complains of being cross-examined. If it were a fact that his character was not good as he sought to leave the impression through his character witnesses, when he took the witness stand and testified in his own behalf, to what better source could the state turn for refutation of good character and reputation than the defendant himself, if the state believed the elements of the foregoing questions propounded to the character witnesses were true? Moreover, the state had a right to inquire of the defendant concerning matters and things with reference to which inquiry had been made of his character witnesses as a necessary predicate for rebuttal testimony as to the truthfulness thereof. If he had admitted the details thereof to be true the state would not have been permitted to introduce the evidence inconsistent with the claim of good character offered in rebuttal. This he did not do; some matters he admitted, others he sought to explain and qualify, others he denied entirely. We can conceive of no other basis upon which rebuttal testimony would have been admissible except in the face of defendant's denial of the truth of the elements contained in the foregoing questions. We cite no authority in support of this conclusion at this time, for the reason that this proposition is not at all unlike the last preceding proposition, and the authorities cited by the defendant in this connection are the same as those he cited and relied upon in support of the last proposition. In this connection, reference will be hereinafter made to the cases he relies on. In relation to the cross-

examination of the defendant relative to his character concerning which complaint as hereinbefore indicated has been made, this court said in Murphy v. State, 72 Okla. Cr. 1, 112 P. 2d 438, 443:

"When a defendant takes the witness stand and testifies in his own behalf, the prosecution has the right to cross-examine him with the same latitude as any other witness. His cross-examination is not confined to a mere categorical review of the matters stated in the direct examination. He may be asked any question on cross-examination pertaining to the matter at issue, or that goes to his credibility as a witness."

In Allen v. State, supra, it was further said:

"In the case of Jackson v. State, 67 Okla. Cr. 422, 94 P. 2d 851, it is stated: 'When a defendant takes the witness stand he is subject to cross-examination by the same rules that govern other witnesses. * * *' "

In Henderson v. State, 59 Okla. Cr. 86, 56 P. 2d 915, this court said:

"When a defendant elects to testify in his own behalf, he occupies a double position. As a defendant, his character cannot be attacked by the state; as a witness, he puts his credibility at issue like any other witness."

Furthermore, in Henderson v. State, supra, this court said in relation to the cross-examination of the defendant who had put his character in issue:

"A defendant's general good character or reputation as to the trait involved in the charge against him is always admissible in his favor to evidence the improbability of his doing the act charged, and, where a defendant offers testimony to show his previous good character, the state may in rebuttal offer evidence of his bad character."

And therein this court said that inquiry may be made as to witness' "knowledge of alleged acts of violence com-

mitted by the defendant at various times prior to the time of the killing on others than the deceased". In relation to the rebuttal evidence offered by the state, in Henderson v. State, supra, this court said: "* * * where a defendant offers testimony to show his previous good character, the state may in rebuttal offer evidence of his bad character."

See, also, Burr v. State, 56 Okla. Cr. 175, 35 P. 2d 740. It therefore appears that the defendant's contention that it was error to cross-examine his character witnesses and himself relative to specific acts inconsistent with good character is wholly without merit.

In support of the foregoing proposition, relative to the contention that the cross-examination of Vance Lowrey was improper, defendant cites Emerson v. State, 18 Okla. Cr. 109, 193 P. 743; Newton v. State, 26 Okla. Cr. 65, 221 P. 1046; Satterfield v. State, 32 Okla. Cr. 98, 240 P. 151; Call v. State, 39 Okla. Cr. 264, 264 P. 643. None of these cases are in point in support of the contention which is made by the defendant relative to the cross-examination of defendant's character witnesses, and the defendant himself as to specific acts inconsistent with good character, for the reason that in none of these cases was the defendant's character put in issue by him, but in each of these cases, the state attempted to prove in its case in chief bad reputation, by offering proof of the commission of other offenses or specific acts showing bad reputation. Clearly such would not be admissible as a part of the state's case in chief, but where as here the defendant places his reputation in issue, and seeks to show that it is good by offering witnesses for that purpose, then the state may make inquiry of such witnesses relative to their knowledge as to specific acts inconsistent with good character and reputation, and may also cross-

examine defendant relative to said specific acts as hereinbefore indicated. The defendant relies on State v. Frederickson, 81 Kan. 854, 106 P. 1061, wherein it was held in a situation similar to this: "* * * Neither party may resort to specific instances of conduct demonstrative of character, nor to the private judgment or opinion of individuals, nor to any fact other than that of general reputation", where the defendant has undertaken to establish good character as an element of his defense. This court has not seen fit to limit the inquiry as has the Kansas court where the defendant undertakes to establish good character as an element of his defense. Since this court does not limit the inquiry to general reputation whether it be good or bad, clearly the Kansas case is not in point. Likewise, the cases of Hooper v. State, 7 Okla. Cr. 43, 121 P. 1087, Stanfield v. State, 30 Okla. Cr. 82, 235 P. 256, Brockman v. State, 60 Okla. Cr. 75, 61 P. 2d 273, are not in point. They are all cases where the state sought to prove the defendant's bad reputation without the defendant having put his reputation in issue. In the Stanfield case, supra, the court said:

"The issue in the trial of a criminal case is single, and the testimony should be confined to the issue. Other offenses should not be injected, unless in some manner or under some exception they are relevant to the case on trial."

Here we are considering the exception to the rule, not the general rule contended for by the defendant. The evidence of specific instances is admissible only as an exception to the rule as a predicate for contradiction of good reputation which the defendant elected to inject into the case. Neither does State v. Frederickson, supra, support the defendant's contention for the reason as hereinbefore pointed out. The case of Stuart v. State, 35

Okla. Cr. 103, 249 P. 159, appears on its face to support the defendant's contention. However, we call attention to the body of the opinion, 35 Okla. Cr. at page 110, 249 P. at page 161, wherein the court said:

"Defendant's counsel, if they saw fit upon cross-examination, might have fully tested the knowledge of the witnesses."

As hereinbefore set forth, in the Oklahoma cases sustaining the state's position, knowledge might have been tested, by making inquiry concerning whether or not the witnesses had ever heard of certain specific acts or offenses committed by the defendant inconsistent with good character and reputation. This they did not do in the Stuart case. Therein lies the distinction between this case and the numerous authorities supporting such inquiry relative to specific acts. For these reasons the authorities relied upon by the defendant to support the last two hereinbefore discussed propositions are not in point. Gale v. People, 26 Mich. 157, People v. Wells, 100 Cal. 459, 34 P. 1078, are cases wherein the defendant had not put his character and reputation in issue. State v. Bell, 206 Iowa, 816, 221 N. W. 521, is not in point for the reason, that here the circumstances though reaching back to 1927 in the case at bar bears such a marked similarity to the issues involved in the instant case that it was entirely proper to make inquiry concerning the same of the character witnesses. In the last referred to case such was not true.

Under his proposition relative to incompetent evidence being admitted by the court in the trial of this case, the defendant complains of the testimony of Bob Butler, father of Juanita Butler, to the effect that his daughter requested him to get her a transfer so she could get away from Lowrey, the defendant. It is the

defendant's contention that the testimony was hearsay and incompetent and was prejudicial and materially contributed to the conviction of the defendant. On this point they cite no authorities. We have found no authority to sustain or reject the admissibility of such evidence. It is well to note in this connection that the defendant claims there had been no trouble between himself and the deceased Juanita Butler, and other than this testimony of Bob Butler there is no reason to believe that she was afraid of him. Moreover, the record discloses that the defendant sought to show he had tried to arrange for other transportation for her and in returning her to Tahlequah, Okla., he was merely performing a service on that fatal evening. In this the record corroborates him. But, under all of the circumstances as shown by the proof, it was pertinent to show the state of mind and attitude of the deceased. Such evidence falls within the exception to the hearsay rule. The reliability of this testimony is borne out in the corroboration of Bob Butler by Tom Roach, to the effect that he, Bob Butler, had approached Tom Roach relative to such a transfer. Bob Butler testified that the reason for her seeking the transfer was because she was afraid of Vance Lowrey. In Starks v. State, 67 Okla. Cr. 156, 93 P. 2d 50, 51, paragraph six of the syllabus reads:

"Explanatory circumstances and declarations connected with the commission of a homicide, which have a tendency to shed light on the motives of the parties, are admissible in evidence, including antecedent declarations made by the deceased and the defendant, where they form some link in the chain of circumstances, explanatory of their motives or other vital issues involved."

This is, in fact, a quotation from the earlier decision of Stogsdill v. State, 24 Okla Cr. 152, 216 P. 681. In

340

Sapp v. State, 87 Tex. Cr. R. 606, 223 S. W. 459, 461, paragraph 24 of the syllabus reads:

"In prosecution for wife murder, declarations of deceased showing her state of mind toward defendant are admissible, but the scope of such evidence should be limited to such purpose, and not used as proof of the facts stated."

On page 468 of 223 S. W. the rule is stated as follows:

"Declarations of the deceased, showing her state of mind toward the appellant, were admissible. Wigmore on Evidence, vol. 1, § 102; Commonwealth v. Howard, 205 Mass. 128, 91 N. E. 397; Porter v. State [86 Tex. Cr. R. 23], 215 S. W. [201] 211. The scope of such evidence would be limited to the purpose stated, and could not be legitimately used as proof of the facts declared. If there was any transgression of the rule admitting such testimony, it was not of a degree to furnish ground for reversal of the judgment. See, also, Smith v. State, 92 Ala. 30, 9 So. 408; Honeycutt v. State, [Tex. Cr. App.] 63 S. W. 639; Wharton's Crim. Evidence. vol. 2, p. 1738."

In Porter v. State, 86 Tex. Cr. R. 23, 215 S. W. 201, paragraph five of the syllabus reads:

"Where the state's theory was that appellant killed deceased and threw her body in a river, and the defense urged suicide, evidence that deceased was cheerful, in a good humor, jolly, and apparently in good spirts continuously for several days prior to her disappearance was admissible, as tending to disprove defense of suicide."

We are of the opinion that the foregoing proof offered by Bob Butler relative to his daughter's desiring a transfer, because she was scared of defendant is admissible, but, we are further of the opinion that the scope of such evidence should be limited to the purpose of showing the state of mind toward the defendant, and is not

to be used as proof of the fact stated. In permitting it to go to the jury, the court should so limit it. The object of this proof by Bob Butler was to supply motive for the killing. It stands alone as the only direct evidence in this regard as to motive. The jury may, however, have inferred from the facts that failure to submit to his sexual desires was the motive. They may have concluded that when he saw the holes in his car the defendant killed the deceased in a fit of drunken anger. In passing, we must observe that the evidence of Bob Butler as to motive constitutes a mighty weak link in the light of contradictory evidence of Mary A. Sims, Minnie C. Manning, Charles Hitchcock and Eldee Starr that Juanita Butler said she liked it in Tahlequah and desired to remain in Tahlequah; the specific reason given to Mary A. Sims was that Juanita's sister was going to school in Tahlequah, and they were going to live together.

The defendant further contends that the court erred in not declaring a mistrial after the fact had been called to its attention that Bailiff A. L. Cole and Sheriff W. T. Thorne entered the juryroom, while the jury were deliberating. This contention is predicated upon the provisions of 22 O. S. A. 1941 § 857, which reads as follows, to-wit:

"After hearing the charge, the jury may either decide in court, or may retire for deliberation. If they do not agree without retiring, one or more officers must be sworn to keep them together in some private and convenient place, and not to permit any person to speak to or communicate with them, nor do so themselves, unless it be by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed, or when ordered by the court."

We call attention to the fact that the foregoing statute is a prohibition against communication with the jury by outsiders or the bailiff or court officials. That does not mean by the spoken or written word only, for we will take judicial knowledge of the fact that communication may be had by facial expression, motions or signs. But not every communication is prejudicial. See Sanders v. State, 50 Okla. Cr. 274, 296 P. 764, 767, wherein this court said:

"The affidavit of the juror, Victor P. Buell, shows conclusively that the jurors paid no attention when the bailiff told them the witness Price had been arrested, and the jury was not influenced by the statement. The bailiff violated the instructions of the court in making any statement to the jury, but, in view of the absence of any showing that the statement influenced the jury, it did not prejudice the rights of the defendant."

Also, in Smith v. State, 19 Okla. Cr. 14, 197 P. 514, where certain jurors had telephone conversations from the juryroom with outside persons. This was held not to be prejudicial where it was shown that the conversations were not about the case. See, also, Mays v. State, 19 Okla. Cr. 102, 197 P. 1064; Scruggs v. State, 34 Okla. Cr. 97, 244 P. 838; Allen v. State, 13 Okla. Cr. 395, 164 P. 1002; L. R. A. 1917F, 210; Chastain v. State, 46 Okla. Cr. 123, 287 P. 826. These cases hold that only such communications as are established as prejudicial to the defendant, are grounds for reversal. Evidence was heard on this proposition in the hearing on the motion for new trial. The defendant offered the testimony of the bailiff, A. L. Cole. The state in rebuttal offered the testimony of one of the jurors, Grover Howe. The factual situation upon which this contention is based is briefly as follows: Bailiff A. L. Cole and Sheriff W. T. Thorne entered the juryroom while the jury was waiting to be

taken out to supper. The jury may or may not have been deliberating upon the entry. That fact is not clearly established in our minds. The bailiff directed the sheriff, W. T. Thorne, to remove certain exhibits. This the sheriff did and left, and then the bailiff had certain conversation with the foreman of the jury in relation to the forms upon which to return the verdict and the court's instructions. More detailed reference in relation to the facts will be made hereinafter. In this kind of case the law presumes prejudice where the bailiff and court officials enter the juryroom during the jury's deliberations. The burden is on the state to overcome the presumption when a proper showing has been made by the defendant of a violation of 22 O. S. A. § 857. This court has so held in the case of Graves v. Territory, 16 Okla. 538, 86 P. 521, 8 Ann. Cas. 649, wherein the bailiff was in the juryroom two or three times. In Ridley v. State, 5 Okla. Cr. 522, 115 P. 628, wherein the juryroom door was opened and the foreman had a conversation with the court clerk in regard to the manner of returning the verdict of five of the jurors who had agreed, after which the door was closed and they resumed their deliberations. Therein this court said in relation to communications and invasions of the sanctity of the juryroom by outsiders, 5 Okla. Cr. at page 526, 115 P. at page 630:

"It is of the utmost importance that jurors and court officials should be held to a strict observance of the provisions of law prescribing their procedure and duties, and their conduct should be such that no possible suspicion can attach to them of having acted in a manner prejudicial to the accused, or in his favor. * * * It will be presumed, in the absence of anything to the contrary, that the rights of the defendant were prejudiced by the action of the jury and clerk of the court in disregarding and failing to observe the requirements of the statute.

Courts cannot be too strict in compelling a rigid and vigilant observance of the provisions of the statutes designed to preserve inviolate the right of trial by jury and the purity of jury trials."

See, also, Selstrom v. State, 7 Okla. Cr. 345, 123 P. 557, and Grable v. State, 60 Okla. Cr. 339, 44 P. 2d 152, wherein the jury, having arrived at a verdict of guilty, apparently seeking divine approbation, requested the bailiff to come into the juryroom and pray. In People v. Chambers, 279 Mich. 73, 271 N. W. 556, 558, the officer of the court in charge of the jury was in the juryroom at least five times for the purpose of taking water and tobacco into the juryroom. The Michigan court said:

"It may be the acts or conduct of the officer had nothing to do with the deliberations of the jury or the conclusions which they arrived at. He had no business in the juryroom. If it was necessary to furnish water to the jurors, it could have been furnished and he could have remained outside. At least five times he was in the juryroom for the purpose of taking in water or furnishing tobacco to the jurors at their request, and the jury room door was closed. On at least one occasion, when he came out of the juryroom he was accosted by Detective Martin who asked him if the jury had agreed upon a verdict and he communicated to the detective that they had not. It is important that the officer be not guilty of any misconduct that could have influenced the jury, and that his conduct not furnish any ground for suspicion the jury was being tampered with or might be tampered with or was deliberating in his presence. It is not what the officer may have said or done any more than his mere presence with the jury that is or may be prejudicial to defendants and tend to cast suspicion upon the otherwise orderly administration of justice. People v. Knapp, 42 Mich. 267, 3 N. W. 927, 36 Am. Rep. 438; Churchill v. Alpena Circuit Judge, 56 Mich. 536, 23 N. W. 211."

In the case at bar, with reference to the sheriff being in the juryroom, he being one of the most interested witnesses and an influential office holder, the foregoing language of the Michigan court is particularly applicable. It is not necessarily what he did, but his mere presence may have been sufficient to prejudice the defendant. It has been held that the rule announced in the Ridley case, supra, in relation to the invasion of the sanctity and purity of jury proceedings by an outsider applies to judges as well as bailiffs and court officials. Green v. State, 65 Okla. Cr. 463, 88 P. 2d 907; see also, Graham v. State, 73 Okla. Cr. 337, 121 P. 2d 308, the latter case being an exhaustive and able opinion by Judge Barefoot, in which the principles therein announced are most persuasive herein; and Raab v. State, 62 Okla. Cr. 361, 71 P. 2d 773; Lewis v. State, 73 Okla. Cr. 172, 119 P. 2d 91; Henderson v. State, 18 Okla. Cr. 611, 197 P. 720; Walter v. State, 29 Okla. Cr. 221, 233 P. 240; Bennett v. State, 42 Okla. Cr. 264, 275 P. 390. The rule quoted from the Ridley v. State case, supra, has been repeatedly followed in subsequent cases and quite recently in Lewis v. State, 73 Okla. Cr. 172, 119 P. 2d 91, and wherein the court quoted from State v. Wroth, 15 Wash. 621, 47 P. 106, 107, the following portion of which is particularly applicable hereto and the proceedings incident to the attempt to correct the erroneous conduct on the part of the bailiff and the sheriff. It reads as follows:

" 'But the law does not subject parties litigant to the disadvantage of being required to accept the statement of even the judge as to what occurs between himself and the jury at a place where the judge has no right to be, and where litigants cannot be required to attend. * * * ' " [73 Okla. Cr. 172, 119 P. 2d 96.]

We see no reason why this rule should be relaxed as regards the testimony of the offending court bailiff. Certainly his evidence should carry no greater weight than that of the trial judge concerning such matters. In applying the foregoing rule, it is pertinent to note that in the case at bar the bailiff testified, in substance, that after obtaining the court's permission to take them out to supper, he pushed the door open and told the jury to cease deliberations. This statement within itself would indicate the necessity for such command was the very fact that the jury was then deliberating. He further said that he then took upon himself to tell the sheriff, W. T. Thorne, to "come in and get the exhibits," and that Mr. Thorne did this and then left. Whereupon Mr. Cole said he asked the foreman "Where was the papers." The foreman replied "What papers?" To which Mr. Cole responded "the verdict and the court's instructions" and one of the jurors said "Here they are". Whereupon Mr. Cole inquired "Have you put anything on these?" He thought maybe they had arrived at a verdict, and the foreman said "No". He said he knew it was not a part of his duties as bailiff to go into the juryroom for any purpose at all, that the foreman could hand him the papers at the door. To which we add that neither was it necessary for either him or the sheriff to enter the juryroom to remove the exhibits. Why could they not have been locked up in the juryroom until the jury returned? Or, if the sheriff was to receive the exhibits, why couldn't they have been removed after the jury left? Mr. Grover Howe, the only other witness to testify in this regard, was not quite certain as to what occurred in the juryroom as revealed by his re-direct examination as follows, to-wit:

"Q. (Mr. Miller) The bailiff, Mr. Cole, has testified that just as he entered the door he said, 'Stop de-

liberations'. Do you know if that happened or not? A. No, I don't remember that. Q. You don't know if he made that statement and if you stopped your deliberations in obedience to that instruction? A. No, sir; I don't remember that. The foreman said, 'Boys, we aren't getting anywhere this way. Let's stop now and go to supper', and we did. Q. (The Court) Did you hear the foreman give any instructions to Mr. Cole about the exhibits? A. No, I don't remember that, but it seems to me Mr. Cole asked the foreman if there was anything on the papers and he said no. Q. That was with reference to the verdict—I'm talking about the exhibits? A. No, sir; I don't remember that."

It is apparent that the jury may have still been deliberating, if we are to believe the foregoing testimony. Further witness' testimony discloses that he heard the bailiff say, in speaking of the exhibits, that "there they are, get them". He did not hear Mr. Cole say "Cease your deliberations", but he said he did not hear the sheriff say a word. It is altogether possible for the sheriff to have said something in the juryroom that Mr. Howe may not have heard, as apparently he did not hear Mr. Cole say "Cease your deliberations". He does not purport to testify whether the sheriff made any signs or grimaces, or whispered to any of the other jurors. This he might have done and Mr. Howe not have seen it. In any event, as hereinbefore pointed out, the sheriff was one of the most influential men in the county. As we have hereinbefore said, he was the most important witness in the trial for the state. Moreover, as we have hereinbefore indicated, his very presence in the juryroom would have a tendency to create influence. It would have a tendency to re-emphasize his testimony in the jurors' minds. It occurs to us that certainly no other witness would be permitted to go into the juryroom and this recall to the jurors' minds by his presence the

strong points of his evidence. Is the sheriff more privileged in this regard than any other witness merely because he holds an official position in the county? We do not think so. The sheriff was not called upon to give his version of the invasion of the seclusion and sanctity of the juryroom. He was out of town. Would it not have been well to have adjourned the hearing on the motion for new trial until his return, the next day? Neither were the other eleven jurors called upon to testify. The explanation for their failure to testify was, it was near the end of the jury term and they had gone home. Why couldn't the matter have been postponed until their attendance on this important question could be had? They were still in the county. It occurs to us that such matters should not be hastily disposed of, particularly in a capital case where a man is being tried for murder. Isn't it altogether possible that the other eleven jurors might have testified to conversations, glances, grimaces, motions or even whispered words on the part of the sheriff and the bailiff designed to influence the jury. Mr. Howe's testimony as to what took place in this regard is not very convincing. Under the law can we say it is sufficient? That brings us to the only vital question herein involved. What evidence is necessary to overcome the presumption of prejudice? As we have hereinbefore said, we must take judicial notice of the fact that the offending bailiff would be more or less hostile. The defendant was compelled to use him to show a violation of the sanctity of the juryroom. No one would say that his testimony standing alone would be sufficient to overcome the presumption of prejudice, even though offered by the defendant. Where conditions were such that more than one juror may have been influenced, can we rightfully say that Mr. Howe's testimony standing alone would be sufficient? Can we say that where one

juror's evidence shows he may not have been influenced, that that one juror could speak for the other eleven? We do not believe the testimony of the bailiff and one juror, standing alone, is sufficient, but how much more evidence is required to overcome the presumption under the conditions herein involved, that is the question. There seems to be a paucity of authority as to what quantum of evidence is needed to overcome the presumption here under discussion. We can think of no reason why, applied to such a situation as herein involved, the rule is less burdensome than that of a civil case. In Fresh v. Gilson, 16 Pet., U. S., 327, 331, 10 L. Ed. 982, it is said:

"But presumptions can stand only whilst they are compatable with the conduct of those to whom it may be sought to apply them; and still more must give place, when in conflict with clear, distinct and convincing proof."

Applied to the case at bar, we do not believe this record is sufficient to remove the case from the realm of speculation and doubt to provide that degree of proof necessary to reach the dignity of being clear, distinct and convincing. We are inclined to believe that the testimony of the bailiff, who, acting in accord with human nature, would be disposed to bolster his position, and that the testimony of the juror who did not hear, see or know too much about the conduct of the bailiff and the sheriff while they were in the juryroom, is not sufficient to overcome the presumption of prejudice herein created. We are inclined to believe that the cases should be distinguished upon the proposition of whether the act committed might have influenced only one juror, more than one, or all of them. Certainly under the latter two conditions more proof should be required than in a case where the communication only extended to an individual juror. It is evident that each case of this kind must be

judged upon its own facts as to whether the evidence is sufficient to overcome the presumption of prejudice. In the case of Graves v. Territory, supra, which was a capital case, wherein the defendant was charged with murder, convicted of manslaughter in the first degree and sentenced to ten years, and where the bailiff was in the juryroom two or three times, ten of the jurors were examined in relation thereto. In the Lewis case, supra, the defendant was charged with the crime of forgery in the second degree, was tried, convicted, sentenced to serve a term of three years in the State Penitentiary, and wherein the jury was permitted to separate, all of the jurors were examined in relation to whether any one had attempted to talk to them or influence them during the period of their separation. In Saunders v. State, supra, wherein defendant was charged, tried and convicted of second degree rape and sentenced to seven years in the penitentiary, evidence by affidavit of only one juror was held to be enough. It is, therefore, apparent that the cases are not in harmony as to the amount of evidence necessary to overcome the presumption of prejudice. We are inclined to believe that the procedure pursued in the case of Graves v. Territory, supra, and the case of Lewis v. State, supra, is much the safer procedure to pursue. In any case the record herein does not disclose that the other eleven jurors could not have been examined relative to what was done and said by the bailiff and sheriff while in the juryroom. It merely discloses that it would have been inconvenient to have recalled them for this purpose. We do not believe that inconvenience or costs should be considered when the defendant's life and liberty are at stake. Certainly the fact that these jurors were not in the courtroom when the motion for new trial was heard presented no obstacle of consequence. Certainly they were available in the county, and they

should have been examined in relation to the conduct of the bailiff and the sheriff. In any event, how can only one juror who saw little, heard less and therefore could hardly have been influenced, speak for the other eleven men on the jury? To hold that he could would always leave the case open to speculation, suspicion and grave doubt, and the charge that the one juror who provided the evidence to overcome the presumption was handpicked by the state, a condition above which the orderly administration of justice should always rise. As in the case at bar, where the jury finally fixed the penalty at 25 years in the penitentiary, the matter should not be left in doubt as to the possibility that the verdict was the result of ulterior influence. The defendant has a right to feel that the jurors were not influenced by the presence of the sheriff in the juryroom. He could only be assured of that by the testimony of a sufficient number of them to remove the matter from the field of doubt. Moreover, we feel constrained to say that the bailiff of the court must at all times protect the jury not only from his own intrusion but also from that of outsiders. It is not necessary at any time that the bailiff pass beyond his post outside the juryroom door. All papers and exhibits should be handed therefrom to him. He is at no time justified in communicating with the jury in any manner about the case except to act as a messenger between them and the court, and to inquire of them from outside the juryroom, if they have arrived at a verdict. He should never permit an outsider to invade the juryroom, even though he be the sheriff—and not even the court except by permission and consent of the defendant, and his counsel and in their presence. The sheriff has no business in the juryroom at any time or without directions from any one. In no other way may the purity of the system be preserved. Under the condi-

tions herein involved we do not believe the state met the burden necessary to overcome the presumption of prejudice, and its failure so to do constitutes reversible error.

Defendant's next contention relative to the court's refusal to give an instruction of second degree manslaughter is without merit. It is without merit for the reason that if under the facts defendant killed the deceased Juanita Butler under a premediated design, the crime is murder. If he killed her in a drunken brawl and while he was so drunk as to be incapable of performing a premeditated design to kill and had no purpose to commit the crime prior to the time he became so intoxicated, he is guilty of manslaughter in the first degree and not of murder. Galliher v. State, 56 Okla. Cr. 430, 42 P.2d 148; Cheadle v. State, 11 Okla. Cr. 566, 149 P. 919, L. R. A. 1915E, 1031; Beshirs v. State, 14 Okla. Cr. 578, 174 P. 577. If he killed her in the heat of anger without premeditated design it would be manslaughter in the first degree. Tyner v. U. S., 2 Okla. Cr. 689, 103 P. 1057; Ex parte Bollin, 3 Okla. Cr. 725, 109 P. 288; Turner v. State, 4 Okla. Cr. 164, 111 P. 988. Under the state's evidence the jury might have concluded that it was either murder or manslaughter. Under the defendant's theory the deceased Juanita Butler shot herself, that he did not kill her. Under the defendant's theory, if believed, he committed no crime and he is therefore entitled to be exonerated. Under the facts herein presented the trial court would not have been justified in instructing the jury on second degree manslaughter as defined in 21 O. S. A. 1941 § 716:

"Every killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder nor

manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

This section has been construed to cover cases "Where the death of a human being is caused by the culpable negligence of another, under such circumstances that it is not murder nor manslaughter in the first degree, nor excusable or justifiable homicide, it is manslaughter in the second degree". And culpable negligence has been defined as the omission to do something which a reasonable and prudent person would do, or the doing of something which such a person would not do under the circumstances surrounding the particular case. Nail v. State, 33 Okla. Cr. 100, 242 P. 270. The facts as presented, either by the state or the defendant, did not warrant an instruction on second degree manslaughter.

Defendant makes other assignments of error which are of so little merit as to constitute no infringement upon defendant's substantial rights; therefore, we will not consider the same. In view of what we have hereinbefore said relative to the bailiff and sheriff invading the juryroom, this case is reversed and remanded for a new trial.

BAREFOOT, P. J., concurs. JONES, J., dissents.

JONES, J. (dissenting). I find myself heartily in accord with most of the observations made in the opinion of the majority. In an effort to more thoroughly understand every phase of this case, I have read and reread the complete record. The more I have read it, the more I am thoroughly convinced of the defendant's guilt. The one obvious fact which cannot be eliminated from consideration in this case is the physical fact of the entry of the bullet and its exit. The entry and exist as shown by the testimony of the physician renders it a physical

impossibility that the shot which snuffed out the life of this young girl could have been self-inflicted. By no manner of contortion could she have assumed a position to where the shot would have entered just left of the nipple on her left breast and come out in the lower part of her body on a vertical line beneath the right shoulder and about where a line from the middle of her back would intersect with a line drawn vertically down her right side from her right arm pit. To further illustrate the impossibility of the shot being self-inflicted, it should be borne in mind that the deceased was right-handed. The defendant lied and admitted he lied to the officers the night he brought the girl to the hospital. The only other time he has opened his mouth to discuss the killing he lied again. The circumstantial evidence without any question of a doubt shows that the shot which killed Juanita Butler was fired by some other person who was present, and the only other person who was present under the admitted facts was the defendant.

Under the statute on homicide, 22 O. S. 1941, § 745, upon a trial for murder where the state shows the commission of the homicide by the defendant, the burden of proving circumstances of mitigation or that justify or excuse it devolves upon the accused.

Instead of the defendant attempting to show circumstances in justification or mitigation of the homicide, he attempted to besmirch the character of this young Indian girl and assert that the shot which snuffed out her life was self-inflicted.

There is one matter in the record which I think is deserving of emphasis. Nowhere does there appear a blemish on the character of the deceased until the de-

fendant himself takes the witness stand and attempts to destroy her character in order to escape punishment himself. So far as the record discloses, with the exception of the testimony of defendant, the deceased was a virtuous young Indian maiden, and I think it is a fair inference from the record that she was trying to defend herself from this brute defendant and that he became so drunk that he lost his head and shot her; that after he shot her he became partially sober and then drove with the body until he could devise in his own mind some scheme and explanation to tell the authorities and thus escape punishment for his acts. There was no odor of intoxicating liquor on or about the person of deceased, and if the evidence of her associates is to be believed, she was a quiet, unassuming, industrious girl. Only from the lips of defendant, who apparently would tell any falsehood to save himself, is there anything against her character.

I think Judge BRETT correctly disposed of each contention presented in the brief of defendant except one. This case is being reversed and remanded by the majority for a new trial on the sole ground that the act of the sheriff in entering the juryroom at the request of the bailiff to gather up the exhibits before the members of the jury panel had left the room to go eat their supper, constituted reversible error. With that part of the opinion I am in total disagreement.

In each of the cases cited in the majority opinion and relied upon as a basis for reversal of the judgment of conviction, there was an unauthorized communication to the jury during their deliberations. In practically all of the cases in which the unauthorized communication was discussed, there were other substantial errors which when considered together with the unauthorized

communication were sufficient to convince the court that the cause should be reversed.

In a consideration of these cases, we find that two things must have concurred before a presumption of prejudice arises: First, there must be a communication to the jury by an unauthorized person; second, the jury at the time of the communication must be engaged in deliberating on their verdict. When these two facts are established, then, as is said in the cases cited in the majority opinion, a presumption of prejudice arises and the burden is on the state to show by clear and convincing proof that no prejudice could have resulted to the defendant by reason of the questioned incident.

As I view the record, the majority opinion is in error and the reason for their erroneous conclusion is because they first presumed that the defendant had introduced evidence to establish the two essential facts above mentioned and then further presumed that prejudice had arisen from the presumed facts. The majority agree that no actual prejudice to defendant is shown by the record, but they say there is a presumption of prejudice and they are basing their presumption of prejudice upon another presumption without requiring the defendant to first introduce evidence to prove an unauthorized communication made to the jury.

In every criminal trial, the burden of proof is upon the state to prove the guilt of defendant beyond a reasonable doubt. After the verdict is reached and judgment and sentence is pronounced, there is a presumption on appeal that all proceedings before the trial court were regularly conducted and the burden is on the defendant to establish prejudicial error. In Edwards v. State, 9 Okla. Cr. 306, 131 P. 956, 44 L. R. A., N. S.,

701, this court held that the doctrine that error in the trial of criminal cases presumed injury is not recognizable in Oklahoma; that, on the contrary, the presumption is that all proceedings in a court of record are regular, and before a conviction will be reversed, the burden is on the appellant to show two things: First, that error was committed; second, that this error materially contributed to his conviction and deprived him of his legal rights. See, also, Anderson v. State, 8 Okla. Cr. 90, 126 P. 840, Ann. Cas. 1914C, 314; Williams v. State, 17 Okla. Cr. 452, 190 P. 892; Harris v. State, 18 Okla. Cr. 470, 196 P. 354; Wright v. State, 35 Okla. Cr. 83, 249 P. 356; Denmark v. State, 71 Okla. Cr. 424, 112 P. 2d 437, 113 P. 2d 608; Nowlin v. State, 65 Okla. Cr. 165, 83 P. 2d 601.

I could do no better than to quote from the applicable language of Judge Furman wherein he states in Edwards v. State, supra [9 Okla. Cr. 306, 131 P. 963]:

"We very much doubt if an absolutely flawless trial from a technical standpoint was ever had in a hotly contested case when able counsel appeared for both sides. If convictions are to be reversed upon immaterial errors, the courts would no longer perform the duty of protecting society, but would find themselves practically the protectors of criminals. * * *

"Judges should always remember that laws are enacted to be enforced, and that penalties are prescribed to be inflicted upon those who violate the law, and that courts are established and supported by the people solely for the purpose of administering justice and protecting the people in their property and in their lives, and that it is a perversion of their powers and duties for courts to administer the law for any other purpose than that of the protection of society. An appellate court has no right to assume that the trial judge, the county attorney, and the jury (or the sheriff in the instant case)

(Italics ours) have entered into a conspiracy to unlawfully deprive a defendant of his liberty. *These persons are all officers of the law and are acting under oath, and every presumption must be indulged in favor of the regularity, good faith, and justice of their action.*

"Before conviction a person charged with crime is presumed to be innocent. A defendant participates in the selection of the jury, and when a juror is accepted by a defendant he thereby vouches for the intelligence, integrity, and impartiality of such juror, and he is bound thereby unless the contrary affirmatively appears from the record. Therefore, after a jury has found a defendant guilty, the presumption of innocence is destroyed, and upon appeal the counter presumption prevails; that is, that the verdict of the jury is right and that the appellant is guilty. Appellate courts have no right to act as counsel for a defendant and hunt for excuses to set aside the verdicts of juries and the judgments of courts, and no case should be reversed unless it affirmatively appears from the record that the trial court committed material error to the injury of the appellant, or that the jury were influenced by improper motives, or that the verdict is contrary to the evidence. There should be an end to criminal trials, for it is the nearness and certainty of punishment which deters criminals and thereby protects society. This court is unalterably committed to the enforcement of these principles for the purpose of protecting property rights and making human life safe and sacred in Oklahoma."

Counsel for defendant in an attempt to establish facts from which a presumption of prejudice to defendant arises introduced the following evidence by the bailiff:

(1) The time for the evening meal having arrived, the jury decided to cease their deliberations and go to supper.

(2) The foreman of the jury notified the bailiff that they were ready to eat their supper. At the same time the foreman inquired of the bailiff as to who would take care of the exhibits while the jury were gone to supper, to which the bailiff replied, "that is the duty of the sheriff."

(3) After receiving the communication from the foreman of the jury, the bailiff returned to the court-room and in open court, in the presence of counsel for defendant and the sheriff, notified the court that the jury wanted to be taken to supper.

(4) The court thereupon directed the bailiff to take the jury to their supper and after they had eaten to return them to their juryroom to resume their deliberations. At that time, while still in the courtroom, the bailiff asked the sheriff to come with him and take charge of the exhibits.

(5) The bailiff returned to the juryroom, followed by the sheriff and six or eight other men from the court-room, among which was counsel for the defendant.

(6) When the bailiff arrived at the juryroom he knocked on the door and said, "cease your deliberations" (according to the testimony of the one juror who testified concerning this incident, the jury had ceased their deliberations when the foreman had first suggested they go eat supper and had prepared to leave the room to eat).

(7) After the bailiff had knocked on the door and said, "cease your deliberations" the bailiff opened the door of the juryroom and entered. He then turned to the sheriff who had not entered the room and said, "there are the exhibits, take them out." The sheriff thereupon entered the room, took the exhibits and immediately de-

parted. He said no word, made no sign, and so far as disclosed by the record never looked at any juror.

(8) The door remained at least half open while the bailiff and sheriff were in the juryroom and they were in sight of counsel for defendant and six or eight other bystanders who were standing just outside of the juryroom.

In the majority opinion, it is stressed that the one juror who testified said he did not hear the sheriff or bailiff say anything and did not notice just what was done. This in itself to me seems important evidence as bearing on the question as to whether the act of the sheriff in entering the room was an incident which had an effect on the jury. It should be borne in mind that the bailiff had already notified the foreman that the sheriff was the proper person to take care of the exhibits. I agree with the majority opinion that the bailiff was misinformed on this point, but irrespective of that, the bailiff had informed the jury and undoubtedly the jury expected the sheriff to take charge of the exhibits as a part of his sworn duty as an elected official of that county. The testimony of the sheriff in the trial of the case, of course, was very important, but he was not giving evidence as a personal interested witness, but was giving testimony concerning evidence which he had obtained as a public official of Cherokee county.

At the conclusion of the hearing the record discloses the following:

"Mr. Bliss: Let the record show that the hearing on this motion has come at the conclusion of a jury term of court and that nearly all of the jurors have been discharged and permitted to go home and that Mr. Howe is the only juror in the Lowrey case now available to testify. The Court: I don't believe any other witnesses

would be necessary. I don't believe there is any controversy about what the facts are in this connection. Mr. Bliss: Let the record further show that the sheriff, W. T. Thorne, is out of the county at the time of this hearing, which was first scheduled to be heard tomorrow, but by agreement has been heard today and that the sheriff is not available as a witness at this hearing today and that is the reason he has not been called. The Court: Anything further? Mr. Miller: That's all we have in present at this time. Mr. Bliss: That's all for the state."

I think the above quotation from the record is sufficient explanation as to why neither Mr. Miller as counsel for the defendant nor the county attorney chose to introduce any further evidence upon the incident in controversy. I agree with the trial court that the facts on this point are not disputed. Evidently, counsel for the defendant saw little dispute in the facts as the testimony of the bailiff showed that counsel for defendant was present in the courtroom when the bailiff entered the courtroom to notify the court that the jury was ready for supper and counsel was standing at the door of the juryroom when the sheriff gathered the exhibits and left. If counsel for the defendant had observed any other fact other than what was established by the testimony of the two available witnesses, he would undoubtedly have had himself sworn as a witness and would have testified concerning what he saw. The little regard held by counsel for defendant for this particular point, which the majority thinks is so important as to justify and require a reversal of the conviction, is shown by the fact that in a 53 page brief, only one page is devoted to a presentation of the facts and the law on this question. Counsel for the defendant did not move for a mistrial nor make any record on this proposition at the time the act was committed, but mentioned it for the first time

in his motion for new trial. Most of the brief of the defendant was devoted to a discussion of two propositions of law which Judge Brett has fully and ably considered and decided adversely to him in the majority opinion, and counsel for defendant only incidentally mentioned the act of the sheriff in gathering the exhibits in connection with a presentation of the various points mentioned in their petition in error.

In the record before us, it is clearly apparent that the jury were not deliberating when the sheriff entered the room, and the sheriff did not communicate anything to the jury nor any individual member thereof. Counsel for defendant did not contend before the trial court and the contention is not made in his brief filed herein that the sheriff made any communication to the jury. As has been hereinabove noted, counsel for defendant was present at the time of the alleged misconduct and did not choose to testify or elaborate upon the testimony of the bailiff. I can agree that the sheriff should not have entered the juryroom and that if it was necessary for someone to guard the exhibits, the clerk or some other person might have been better in this particular case; but, as I view the record, the act of the sheriff did not influence the jury and was at most an irregularity which did not affect their deliberations.

It should be borne in mind that it is not every irregularity in the trial of a criminal case that justifies a reversal, but, all that justice in its solemnity requires is that the trial be in substantial compliance with the law governing the prosecution for the crime involved.

In my experience upon the appellate bench, I have found that it is often too easy to take a dead record and search for error and forget the living trial. It is my

frank opinion that if this individual is tried 20 times, that in every trial some irregularity will creep into the case that would serve as an excuse for a reversal. We constantly find irregularity in the trial of every criminal case, especially where as in a case such as this there are able counsel on each side presenting their views. Complex questions and incidents often arise during a trial, but it is my opinion that an appellate judge should never use a mere technical irregularity which shows that it did not affect the outcome of the case as an excuse to reverse a conviction of a person who has committed a crime against the laws of this state.

Far too often able counsel (and this is not meant as a criticism of them) in their search through a dead record find an incident which appears as an irregularity to them and present it in such a manner that verily they make a molehill appear as a mountain. I am afraid that this molehill of relative unimportance has assumed mountainous proportions in the eyes of my colleagues.

I regret that my associates and I disagree upon the proper disposition of this appeal, but, I cannot find any substantial basis in the record upon which I can join them in reversing this case for another trial.

Dissenting opinions often serve very little purpose, and, of course, do not establish the law of the case, but, because of the great importance of the question involved, I have written the foregoing so as to partially explain the reasons for my dissent.