## WHITTEN v. STATE.

No. A-11438. Oct. 17, 1951.

(236 P. 2d 706.)

394

Andrews & Stipe, McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Fred Hansen, Asst. Atty. Gen., for defendant in error.

POWELL, J. The appellant, who will hereinafter be referred to as defendant, was charged by information filed in the district court of Pittsburg county with the crime of manslaughter in the first degree, was tried before a jury, convicted, and his punishment fixed at four years imprisonment in the State Penitentiary. The punishment was the minimum for the crime charged. Tit. 21 O. S. 1941 § 715. Appeal has been duly perfected to this court.

Counsel for defendant has filed a very able brief in which some twelve specifications of error are set out, but which are argued together, and involve the admission and rejection of evidence, instructions to the jury, and alleged misconduct of the county attorney, etc.

At trial counsel for defendant elected to make their opening statement following the statement of the county attorney, and prior to the introduction of evidence by the State. The gist of the statement was to the effect that the defendant, while acting as room clerk at the Dyer Hotel and after he had retired for the night in an upstairs room, was pounced upon and beaten up by the deceased Charles Miriani and another man, bound with a pillow slip and gagged by having a paper sack stuffed in his mouth and throat, was threatened, cursed and robbed of his money. Counsel proceeded over the objection of the county attorney to recite the details of the alleged robbery; he stated that defendant did not know the deceased at the time; that deceased told defendant that if he told about the robbery that he would kill him. Defendant soon freed himself and 'phoned the police and shortly thereafter Miriani's half brother 'phoned the police that Mariani and another were in his place raising a disturbance and the police arrested these boys and it developed that they were the ones that had robbed the defendant and a charge of robbery was filed against them.

Counsel proposed to show that after the alleged robbery, Charles Miriani was seen around in front and across the street from the Dyer Hotel looking up at the window where the defendant lived and that the defendant was "somewhat" afraid of him. That on the day of the killing defendant was in Klapp's drug store under the Dyer Hotel and that he saw deceased across the street from the hotel and pointed him out to one of the parties in the drug store, and that defendant went back up stairs and he saw Miriani come across the street toward the drug store, but did not know where he went; that defendant decided to go get breakfast at the Anchor Cafe near the railroad tracks on South Main Street, but as he passed the Country Club Bar decided to go in and have a beer; that he did not immediately see Miriani when he entered but saw "a fellow" who was a roomer at the Dyer Hotel and who stood between him and Miriani, and the roomer said something that defendant did not understand and that defendant said, quoting counsel:

" 'What do you say, boy?' talking to the man who lived in the hotel where he worked, and that at that time Mr. Whitten sees Charles Miriani, the big boy, who had turned on his stool and said, 'You told it, didn't you?' and made some move and Mr. Whitten will tell you what that move was himself, and that at that time, of course, Mr. Whitten had been afraid, and thought a great deal about what this boy could do to him—as a matter of fact, he had already experienced as to what he could do, as you will remember, the night of the robbery; that at that time he thought perhaps the man who lived in the hotel was trying to warn him that Miriani was there, and the first thing he thought about was defending himself because he knew he was going to have to do it. So, he pulled a gun and fired two shots into the body of Charles Miriani."

The evidence on the part of the state established that around 10 o'clock the morning of September 5, 1949, Charles Miriani was shot and killed while sitting at a counter in the Country Club Bar, McAlester, and that defendant, Whitten,. who entered the bar some time after the deceased, using a .38 Colt Automatic pistol, fired two shots into Miriani almost immediately after entering said bar, the first shot entering the corner of deceased's right eye and coming out at the left upper part of the head, and the second shot entering his body about the top of the hip, right side, and coming out at the left side. The deceased weighed around 200 pounds and was about 25 years of age. He was unarmed.

Ruby White testified that she was employed as a bar maid at the Country Club Bar in McAlester on the 5th day of September, 1949; that around 10:30 that morning Charles Miriani was in this place, sitting at the bar near the curved place and some three seats from the door; that Henry Corder, the owner, and about a half dozen customers were present; that she had sold Miriani one bottle of beer; that he sat across the counter about two seats to the east of her and was facing north with both hands on the counter as the defendant Whitten entered the Bar to the rear of Miriani; that Whitten appeared nervous and was reaching his hand in his shirt. Witness further testified:

"Q. Now, then, what did he do? Tell what he did after he came in the front door? A. Well, he walked past Miriani and reached in his shirt and took out a gun. Q. When he took out his gun where was he standing in relation to where you were standing? A. Right opposite. Q. About like I am here—if Miriani was where I demonstrated a minute ago? A. Yes. Q. And took out a gun? A. Yes. Q. Then what did he do? A. He spoke to him. Q. He spoke to who? A. Miriani. Q. What did he say? A. He said, 'What do you say there, boy?' Q. Did Miriani say anything? A. He said 'I didn't say anything', or something like that. Q. When he spoke to Charles Miriani, where was Miriani's hands at that time? A. As far as I know they were still on the bar. * * * Q. After Charles Miraini said 'I never said anything', what happened? A. Whitten shot him. Q. Do you know where he shot him—what position of the body? A. Shot him in the temple. Q. What did Charles Miriani do? A. He slumped toward the bar. Q. Where were his hands at that time? A. They were on the bar. Q. Then what happened next? A. He shot him in the side. Q. Now, were the shots fast or slow—or how— tell how they were fired? A. Well, they weren't fast—there was a slight pause between them. Q. Can you demonstrate by saying 'bang, bang' how quickly they were? A. No, I couldn't. Q. Was there a slight perceptible pause? A. Yes. Q. Then what happened to Miriani? A. After the second he fell to the floor. Q. Did Charles Miriani ever turn on the stool and face Oliver Whitten? A. He turned his head. Q. Did he ever turn any portion of his body? A. No. Q. Just his head toward where Oliver Whitten was standing, is that right? A. Yes, sir. Q. What did Oliver Whitten do after he shot Charles Miriani? A. He walked out. * * * Q. Did you see Charles Miriani have any weapon of any description? A. No. Q. Did Charles Miriani make any move or make any action whatsoever toward Oliver Whitten prior to the time he was shot? A. No, he didn't. Q. And you state his hands were on the bar at the time he was shot the first time and he slumped down? A. Yes."

Henry M. Corder testified that he operated two taverns, one being the Country Club Bar, McAlester; that on September 5, 1949, he was in this bar and that around 10:45 a.m. Charles Miriani was sitting inside and at the bar about the third seat from the curve in the bar; that witness was at the east end of the room, facing the door. Witness further testified:

"Q. Tell the Court and jury what you saw and heard there? A. Well, I was at the east end of the shuffle-board, which is east and west in the building, and I was play shuffle-board when Mr. Whitten entered the door. I glanced up— I never noticed him any more and just a moment later a shot rang out and I glanced up and by that time the second shot fired and this boy—about the time the second shot fired, this boy was beginning to slump. He slumped down, his head leaving the bar and his body pushed him off after his head reached the bar, into the floor. Q. How was he sitting in relation to the bar when you turned and saw him? A. He was sitting facing the bar with his body, and his head turned to the right. Q. Where were his hands? A. On the bar. Q. Did you see the first shot fired? A. No, sir. Q. Did you look up in time to see the second? A. I glanced up and saw the second fire which was immediately after the first."

Witness further stated that a customer by the name of Spessard was ten feet east of Miriani, and that the defendant was standing about midway between Spessard and Miriani and to the rear about three feet from the counter and behind the stool, when he was shooting; that Ruby White, the bar-maid, was practically opposite or across the counter from the defendant Whitten at the time of the shooting. He stated that at no time did he see Charles Miriani make any motion to make any effort to action toward Mr. Whitten; that Miriani's body was facing up toward the bar and that his hands were on the counter; that after Whitten fired the second shot and Miriani fell to the floor that defendant looked at him a moment, walked around him, and walked out the front, with his gun in his right hand.

M. L. Spessard testified that he was manager of the Oklahoma Distributing Company in the city of McAlester; that on September 5, 1949, he was in the Country Club Bar; that the counter or bar ran east and west; that Charles Miriani was sitting at the bar; that witness sat three stools away, two other customers were closer to Miriani. Witness was asked and answered as follows:

"Q. Now, then, did you see Oliver Whitten come in that morning? A. Yes, sir. Q. You saw him enter the door? A. Yes, sir. Q. What did he do when he came in? A. He just, all I heard or said or done—he walked directly behind the fellow next to Miriani and reached over and touched this fellow on the shoulder and asked him what he said. Q. Touched who on the shoulder? A. Miriani. Q. And said what? A. 'What do you say, boy' or 'buddy'—I never did know which of the two, but it was one or the other. Q. Did he have a gun in sight at that time? A. Not that I saw. Q. When did you first see the gun? A. When he pointed it at the man. Q. When did that fellow—immediately? A. Almost as soon as he walked in. Q. Now, then, did Charles Miriani answer him or say anything to him? A. He turned his head to answer, evidently to answer whoever said 'What do you say' and I don't know whether he talked to him or the man next to him, but he said he didn't say anything. Q. He said, 'I didn't say anything'? A. No. Q. You don't know whether he was speaking to the man next to him or to Oliver Whitten? A. No. Q. Did he turn his body when he said that? A. Just turned his head. Q. How was he sitting in relation to the bar? A. Directly facing it. Q. Where were his hands? A. I couldn't tell you that. Q. You don't remember, or don't know? A. No. Q. After Charles Miriani said 'I didn't say anything' what happened? A. Well, he just had turned his head a fraction there and just as he did, he got shot. Q. Just as he turned his head he got shot? A. Yes, sir. Q. Did you see the first shot fired? A. Yes, sir. Q. Did you see the second shot fired? A. Yes, sir. Q. How quick were they together? A. Seemed like to me right together, not over four or five seconds between them, if that long. Q. What happened to Charles Miriani after the first

shot was fired? A. He slumped just a little bit on the counter and backwards off of the stool on the floor on his back. Q. Was that after the first or second shot? A. He was falling before the second shot fired. Q. Do you know where his hands were when the second shot fired? A. No. Q. Did you hear him say anything else? A. He didn't utter a word. Q. Did you hear Oliver Whitten say anything else? A. Not a word—he turned around and walked out. Q. Did you see Charles Miriani make any motions toward to take any action or do anything toward Oliver Whitten prior to the time the shooting started? A. No, I didn't."

Marie Casey testified that she and Ina Mae Ayers were in the Country Club Bar at the time of the fatal shooting of Charles Miriani; she was sitting at the curve in the bar and in direct line of fire, and did not see defendant until the first shot was fired, when she noticed that Miriani had been shot in the side of the head and his head slumped to the counter in his hands and then a second shot was fired by the defendant and Miriani fell from the stool to the floor.

The state used the undertaker who moved the body, and examining physician as to location of wounds, cause of death, and officers concerning identification of firearms, etc. This concluded the evidence on behalf of the state.

The defendant offered no witness to give evidence as to the circumstances of the killing. He did offer a number of character witnesses who had worked with him in a CCC camp years prior to the tragedy, and who had known him since and who stated that the defendant Whitten had the reputation of "being a peaceable and law-abiding citizen in the community in which he lives." Thus he voluntarily brought his character into issue. On cross-examination the witnesses in question denied any knowledge of the defendant having violated the law by selling whiskey. Counsel had strenuously objected to the witnesses being asked such question on cross-examination.

The record indicates that the state was acting in good faith in the cross-examination of defendant's character witnesses and of the defendant, because in addition to the admissions obtained from the defendant on cross-examination, evidence was produced to show that the defendant at the time he sought to file charges against the deceased for alleged robbery of him, that it was for taking money and whiskey that he was handling for his employer. This justified the questions asked.

In Lyons v. State, 76 Okla. Cr. 41, 133 P. 2d 898, 900, this court said:

"When a defendant places his character in issue, the state has the right to thoroughly cross-examine him and the witnesses offered in his behalf. This right has often been upheld by this court." See cases cited.

We further said:

"It is permissible, on cross-examination of a witness who has testified to the good character of a defendant, to show the sources of his information, and particular facts may be called to his attention, and he may be asked if he ever heard of such facts. This is permissible, not for the purpose of establishing the truth of such facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given to his testimony."

See, also, Lowrey v. State, 87 Okla. Cr. 313, 197 P. 2d 637; and cases cited.

Defendant testified in his own defense. He claimed that he had asthma and was not stout, weighed only 110½ pounds, lived at the Dyer Hotel or rooming house and acted as room clerk there, was 62 years of age. He testified that he first became acquainted with the deceased, Charles Miriani, on the night of August 3, 1949; that he had retired when Miriani and a man by the name of

Wofford came to his room and Wofford asked him if he had a room and as he went to dress, Miriani hit him and knocked him down, then tied him up and gagged him and robbed him first of money that he had in his pocket, and later of money that he had in a billfold hidden under a bedsheet, and after warning him not to report the robbery, left in company with Wofford; and that upon freeing himself he reported the alleged robbery to the proper authorities and caused a warrant to be issued for their arrest.

The only problem presented in this case involves the cross-examination of the defendant as to what he in truth reported to the officers was stolen from his room in addition to the $40 in money, and what he told the officers as to the ownership of this property and his connection therewith. Also, the cross-examination of the character witnesses as to their knowledge of such activities theretofore purportedly admitted by the defendant.

There was nothing in the record that could be made the basis for a claim of error until the defense interposed over the objection of the county attorney, matter antecedent to the killing and insisted by the defense as bearing upon it. Such situations always pose a problem for the trial judge and the prosecution as to the extent of the cross-examination, when some matter is thus voluntarily interjected by the defendant. It is difficult to keep the record entirely free from error. Our problem is to determine if the error complained of has probably resulted in a miscarriage of justice or constituted a substantial violation of a constitutional or statutory right. Tit. 22 O. S. 1941 § 1068.

Defendant testified that after the robbery he saw Miriani at the county attorney's office when the charge was filed, and saw him a number of times standing across the street from the Dyer Hotel looking up at the windows. Counsel for defendant further asked:·

"Q. Was any statement made to you by any person as to whether or not Miriani was carrying a gun for you, or anything of that sort? A. Yes, sir. Q. Who? Mr. Wetsel: Object to that—I would like to know if the statement was made before or after the shooting. Court: You may ask when it was. Q. When it was? A. Well, it was about two or three nights after he got out of jail, his brother was the one that told me to watch him." [Objection to this statement sustained.]

Counsel contend this ruling on the part of the court constitutes error. However, it will be noted that only the alleged statement by Miriani's brother, "to watch him", meaning to watch Miriani, was excluded. This was·not error. The court expressly told defendant: "If there are any threats they are admissible."

Defendant further testified that on the morning of September 5, 1949, Labor Day, he noticed Miriani standing across the street from his hotel by the mail box, and which was also a bus stop. A few minutes later defendant decided to go to breakfast, but in passing the Country Club Bar decided to go in there and get a bottle of beer; that this was around 10:00 a.m.; that when he got in he saw Miriani sitting at the counter, and he saw a crippled and "mentally off" person he knew by the name of Chic, that Chic was east of Miriani and between defendant and Miriani. He testified

"Q. Anything pass between you and Chic? A. I walked up to the bar and called for a bottle of beer. I don't know what he said—he said something to me, and I didn't understand him. I said, 'What do you say, boy?'—I called him boy—Q. And then what happened? A. I looked up then and when I did Miriani looked at me and said, 'You told it, didn't you?' Q .Who? A. Miriani said, 'You told it, didn't you?' He didn't say what. He just said, 'You told it,' and started his hand in his bosom and when he did that, well— Q. What did he do with

reference to the bar? A. He threw one hand on the table and turned in his chair and said, 'You told it, didn't you?" Q. How far was he from you? A. He must have been—I expect—12 feet—I don't know exactly."

Witness stated that he shot Miriani because he thought Miriani was fixing to get a gun from his shirt bosom. Witness was asked by his attorney: "Why **were you carrying a gun at that time?** A. Because I was afraid to meet him without one." Witness denied that he got his gun and followed Miriani to the bar.

On cross-examination the county attorney made inquiries of the defendant concerning some of the matters that he testified to about being robbed by Charles Miriani and another on August 3, 1949, as he had testified to on direct examination. Particularly the county attorney asked him what property he had reported the loss of at the time of the robbery as a basis for the charge against Miriani. But he first asked him if he had sold whiskey at 7½ East Choctaw (the location of the Dyer rooming place). All these questions were objected to by counsel for defendant. Defendant answered that he did not sell whiskey. Counsel then contended that the state had made defendant its witness and could not cross-examine him and was bound by his answer of "no". The court, however, in view of the fact that the defendant on direct examination had testified that Miriani had robbed him of money and that witness had a warrant issued for his arrest on said account, overruled the objection, and permitted the state to cross-examine defendant as to the property he had reported as having been taken by Miriani and one Wofford. The county attorney over the strenuous objections of counsel for defendant, asked:

"Q. Do you recall a question being asked you with reference to how many pints of whiskey being taken and you explained some 15 or 16 pints being taken out of the dresser drawer—all mixed brands? A. I don't know whether I made that or not. I don't think I did. I don't say I didn't. I don't think I did. I think I remember that question being asked how much whiskey was taken."

Witness further stated that the money stolen belonged to Joe Ardeas, his employer. But he denied making any statement to the effect that he was selling whiskey for him. He was asked: "Did you have any whiskey in your room that night? A. Yes, I had a pint there. Q. How many half pints did you have in there? A. I don't think I had any half pints, I don't say I didn't."

Defendant admitted that previous to seeing Miriani the morning of the killing he drank a bottle of beer at the G. D. Jones Broadway Bar, and may have drunk two bottles. He still insisted that he was not looking for Miriani when he entered the Country Club Bar with the .38 automatic pistol in his shirt.

On rebuttal Roy Anders, Chief of Police at McAlester, testified that he was present when defendant reported the August 3, 1949, robbery to the county attorney, and that he reported that around $40 in money and some whiskey had been taken from his room, and that he further stated that the money and whiskey belonged to his employer, Joe Ardeas. Witness remembered defendant describing the whiskey as being half pints.

By reason of Whitten having on cross-examination denied reporting to the county attorney that the deceased had also robbed him of whiskey in addition to the forty dollars in money alleged by him to have been taken, counsel first argues that the state was bound by such answer and was precluded from pursuing the matter further, citing many cases from this court, and textbook authority, to the effect that a witness cannot be impeached by evidence of particular wrongful acts, or be cross-examined in relation to matters not directly or indirectly involved in his direct testimony. This has been the rule in this

jurisdiction from the beginning. Counsel contend that the testimony concerning the whiskey related to a collateral matter. If so, counsel's contention would be valid.

We do not approve of the direct question asked defendant by the county attorney on cross-examination, and being: "Now, then, did you sell whiskey down there at 7½ East Choctaw?" which defendant answered in the negative, even though the State for impeachment purposes later produced evidence by way of testimony of chief of police Anders that defendant did say at the time he reported the assault and robbery that he had testified to on direct examination, that "it was Joe's whiskey and he was selling it for him." Rather, the State should have inquired of defendant whether or not he had at the time of issuance of the warrant for the arrest of Miraini, stated that he had been selling whiskey for Joe Ardeas, and that the stolen whiskey belonged to him.

As stated, the question of the assault and robbery was interposed by the defendant. It was not a collateral matter. It was directly involved and extremely important to the defendant to show his recent relationship with the deceased and how he had been beaten up and abused by him and how he had incurred deceased's enmity by having him arrested. All this developed a basis for his professed fear of the deceased. But it so happens that the very thing that he had deceased arrested for was not to the credit of the defendant. The assault was only incidental to the robbery and taking of the money of his employer and of the contraband goods. The county attorney would have been most derelict in his duties if he had sat back and condoned the erroneous and false statement of the defendant, if in fact false, that the deceased had only robbed him of money, when in truth and fact it was money belonging to his employer, and whiskey belonging to his employer which he stated he had been selling for him. Not a particular sale, but as a course of business.

Since defendant voluntarily interjected into the case the alleged August 3, 1949, assault and robbery and saw fit to detail the alleged facts involved, and which culminated in the killing, defendant cannot complain of his cross-examination concerning such matters so interposed by him, and which tended to develop the complete story. The evidence of every witness to the killing tended to show that defendant deliberately shot the deceased who was unarmed, without deceased ever making any move whatever toward molesting the defendant. Nevertheless, the jury, in the face of such evidence assessed the minimum penalty for manslaughter in the first degree. The only explanation is that they sympathized with the defendant, as no doubt intended and hoped for by defendant and his counsel, by reason of the detailing of the previous assault and robbery, which though it did not entitle defendant to kill said Miriani, was considered as a basis for the claimed fear on the part of the defendant for Miriani, and was apparently considered as explanatory of his later conduct. But the effect of defendant's testimony by which he sought to and did profit, was to deny that he had reported to the county attorney that he had been robbed of whiskey that he had been selling for one Joe Ardeas. If he was suppressing an important fact, after electing to go into the subject, it was important that the jury know this in evaluating defendant's testimony as to the facts of the killing. It would affect the weight of his evidence. Defendant's impeachment by the testimony of Chief of Police Anders contradicted the testimony of his character witnesses that he was a peaceable and law-abiding citizen—not by a specific sale, but by his admission that he had been in the business for Joe Ardeas. We conclude that the matters complained of were not, under the circumstances recited, collateral, and that therefore the cases cited by defendant do not apply.

Otto Lackey testified that he worked in Klapp's Drug Store under the Dyer Hotel, and that on the morning of the killing, Labor Day, September 5,

1949, defendant was in the drug store and pointed Miriani out standing by the mail box at the bus stop across the street; that defendant left and later on returned all nervous and with a pistol in his hand and asked witness to call the sheriff. He was further asked by counsel for defendant: "Do you know anything about Mr. Whitten's health? A. Well, not exactly." The court sustained an objection to this line of examination and also as to whether defendant ever purchased "asthma medicine" from him. No attempt was made to qualify the witness as a medical expert or as a physician, and the exclusion of such testimony was not error.

Counsel for defendant objected to each of the 21 instructions given by the court, except the first two stock instructions. The defendant submitted three requested instructions, which the court refused to give. We have carefully read each instruction given by the court and find that they cover all the material issues involved in the case. Defendant's requested instruction No. 3 concerning the matter of the evidence as to defendant reporting whiskey as well as money being taken from him by the deceased, and suggesting the caution that "The evidence admitted was not for the purpose of proving or disproving this charge except insofar as it might affect the credibility of the witness" was not as clearly included in the instructions as might be. But there is no indication that the jury was misled. The purpose of the evidence was called to the attention of the court and jury at the time brought out by cross-examination and through Chief of Police Anders.

In Horn v. State, 13 Okla. Cr. 354, 164 P 683, this court said:

"When the instructions of the court properly submit all the issues in the case fairly and impartially, it is not necessary to submit additional requested instructions, emphasizing some peculiar phase of the case."

The case is affirmed.

BRETT, P. J., and JONES, J., concur.