**Leroy CARTER, Plaintiff In Error,**

v.

**The STATE of Oklahoma, Defendant
In Error.**

**No. A–12121.**

Criminal Court of Appeals of Oklahoma.
Jan. 26, 1955.

Cecil E. Robertson, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Leroy Carter, who will hereinafter be referred to as defendant, as in the lower court, was charged by information filed in the district court of Muskogee County with the crime of burglary in the first degree. On trial the jury found the defendant guilty of burglary in the second degree and fixed his punishment at a term of four years in the State Penitentiary at McAlester.

The information charged essentially that the burglary was committed by the defendant on or about July 25, 1953, in the nighttime, by defendant prying open a rear screen door of the dwelling house of one Lawrence Beach, located at 715 South Third Street in the city of Muskogee, in which there was at the time some human beings, with the unlawful intent, etc., of Leroy Carter, to take, steal and carry away certain personal property located therein, etc.

For reversal, although a number of specifications of error are set forth in the petition in error, the gist of complaint involves but one essential question, and being whether or not the evidence was sufficient to sustain the verdict of the jury.

To sustain the charge the State produced four witnesses, and being two of the occupants of the house allegedly entered by the defendant, and the two officers making the arrest. The defendant did not testify and offered no evidence specifically contradicting the testimony of Darlene Hensley who identified the defendant as being the man breaking into her room by way of a screen door to the kitchen.

Three witnesses were called by defendant, who testified to matters hereinafter summarized.

The problem will be to determine whether there was competent evidence produced to sustain the verdict of the jury. Lowrey v. State, 87 Okl.Cr. 313, 197 P.2d 637; Walker v. State, 92 Okl.Cr. 256, 222 P.2d 763.

The evidence discloses that the burglary in question took place at about 4:30 in the morning on Saturday, July 25, 1953, at the home of Lawrence Beach, 715 South Third Street, Muskogee. His home was a duplex, containing two bedrooms, and a small hall and kitchen. The principal witness for the State was Darlene Hensley, the step-daughter of Lawrence Beach. She was between 9 and 10 years of age at the time, becoming 10 in December of 1953. At the time of the trial in April, 1954 Darlene was in the fifth grade at school.

The evidence developed that Beach and his wife occupied the front bedroom, and that two step-daughters and an infant son occupied the bedroom to the rear, which was connected with the front bedroom by a little hall, and in this hall was a small clothes closet in the form of a chest of drawers, and the door leading into the hall had a full-length mirror on it. This door remained open at night between the room of the parents and the children, and a light on the chest of drawers was kept burning all night. The light reflected in the full-length mirror when the door was open. There was a door from the children's bedroom into the kitchen. There was a door in the kitchen to the outside of the house, and it was left open on account of the heat, but the screen door was kept fastened.

The mother of the children on the night in question was working at a glass plant from midnight to 8 a. m. The husband had been away, but had returned on Friday. The wife was using the family car which was usually parked in front of the home.

Darlene testified that the two beds in her bedroom had been pushed together on the night in question, and her little sister and brother were sleeping with her, and she was sleeping on the outside. She said that she was awakened, but did not know exactly what awoke her. Said she: "A. I woke up and looked around and I saw a man on

the floor and I thought it was my daddy. We have comic books around there, and I thought he was looking for one under the bed. Q. Your daddy sometimes reads those comic books? A. Yes, sir." Witness further testified that she was able to look at the comic books while in bed by aid of the light that was reflected in the mirror. She stated that it was about day-break when she was awakened. Witness stated that when she looked at the man on the floor the second time she discovered that it was not her father, and she said: " * * * I jumped up and screamed and hollered for my daddy and when I jumped I kicked the man in the head." Witness demonstrated to the jury the position the man was in on the floor. She stated the man looked up at her, that he had on a white shirt with cufflinks and had on blue trousers. Said she: "His arms were out in the light and I could see red shining from the cufflinks on his arms." She further stated that the man was partially bald-headed and that his shirt was outside his trousers and that he was a colored man. She testified that she screamed and ran towards her father's bed room, and the man ran into the kitchen and out the back door. She stated that her father ran out on the back porch and looked out to see if he could see anyone, and then came back in the house and went to the front porch and into the adjoining apartment to telephone the police and soon officer Limbird came to their home and asked Darlene to give a further description of the man, which she did. That officer Limbird then went to his car and returned with another officer and the defendant. She stated that she and her father were on the front porch and the officers brought a man to the porch and asked her to look at him. She stated that she recognized the man as being the one she had seen down on his hands and knees in her room a few minutes before. She was asked: "Are you positive that is the man? A. Yes, sir; I'm positive. I'd never forget his face. If he was covered up with a blanket clear up to here [demonstrating] I'd know him". She said that she would remember his eyes, and that he did not have a mustache at the time.

On cross-examination witness stated that she looked the man straight in the face before she screamed; that she noticed that the white shirt was wrinkled in the ends of the shirt. She also said that she told her father that a colored man had been in her room but had run out the back door and that she described the man to her father before he telephoned the police.

Lawrence Beach testified that his home was on the west side of Third Street, that there was a church south of his home, and next is West Southside Boulevard, and that a colored man lived two or three houses behind him. He said there was a vacant lot on the south side of the Church. He testified that on the morning of July 25, 1953, he heard his daughter Darlene scream "Lawrence" and he jumped up and ran to her room and met her at the door opening from their bed room into the hall. She told him there was a colored person in the house, and witness ran to the back door and looked out and could see that someone had run across the lawn but that he did not see anyone. He was asked: "How do you know that someone had run across the yard? A. Well, there was a very heavy dew that morning, and I had just mowed our lawn the evening before and in behind was this vacant lot with some tall weeds in it and you could see where somebody had disturbed the grass in going across there." He said the tracks went southwest of the house angling across the corner to the Church house. He stated that he had mowed the lawn that day (Friday) but did not catch the grass. He testified that his daughter had described the man seen in her room, saying that he was a colored man, with a white shirt with the shirt tail out, and that he did not have much hair. Witness telephoned that information to the police, and ten or fifteen minutes later officer Limbird came to his home and got a more detailed description from Darlene, who then told the officer that the man had a pair of red or brown cufflinks in his shirt sleeves. The officer then said that he had a fellow in his car, and brought him to the front porch and cautioned Darlene, "Don't say anything but just look him over

good." That Darlene asked that the person turn around, and then the officer took the prisoner back to his car and returned and his daughter told officer Limbird that the prisoner was the person who was in her room a few minutes before.

Officer Lamons Limbird testified that he was on duty at 4:41 in the morning of July 25, 1953 and was in his patrol car and received a radio call that there was a prowler at 715 South Third Street. Policeman Williams was in the patrol car with him, and while on their way to 715 South Third Street, just as they turned off of Seventh Street onto West Southside Boulevard, they saw a man standing on the north side of the street. Upon approaching him, the man crossed the street and officer Limbird got out of the patrol car and talked to him. This was about a block and a half from the home of Lawrence Beach. Witness was asked how the man was dressed, and stated: "He had on a white shirt and blue trousers and a felt hat, and his shirt was out of his trousers."

Officer Limbird further testified that he placed Carter under arrest and then drove from there in the patrol car to 715 South Third Street, and he went into the house alone and talked to Lawrence Beach and the little girl, Darlene. The witness said he asked her to describe the subject, and stated: "She said he was a heavy-built, colored fellow, partly bald, wearing a white shirt with the shirt partly out of his trousers, and wearing blue trousers." Witness further stated that Darlene also told him that defendant had cuff links in his shirt.

The officer stated that after talking to Lawrence Beach and Darlene he returned to his car and held out the defendant's arm to see if he had cuff links, and observed that he did. The witness then identified the cuff links that he said were taken out of the shirt defendant was wearing at the time of his arrest. He also identified the pants and shirt defendant was wearing at the time. Witness swore that Darlene Hensley identified the defendant as being the man she saw in her room that night. He further stated that the defendant's trousers were wet around the bottom and

that he had some small cuttings of grass on the soles of his shoes when arrested by the officers.

Officer Tom Williams testified that he was with officer Limbird in the patrol car when Leroy Carter was arrested. His testimony was largely in corroboration of the evidence of officer Limbird.

It was developed in cross-examination that the defendant was within a few feet of his home when he crossed the street to the point of his arrest. He was permitted to advise his wife that he was going with the officers. It was not developed that the defendant made any statements to the officers explaining his movements just prior to arrest.

The court overruled a demurrer to the State's evidence, and the defense called Homer Ray, a commercial photographer, who, in the words of counsel for the defendant: "Displayed some pictures taken between Third and Fourth Streets on what is known as West Southside Boulevard; the pictures were offered for the purpose of showing the proximity of the defendant's house to the scene of the alleged crime."

Devoy Hill testified that at the time of defendant's arrest he was working at the same garage where defendant worked and that he was arrested the Sunday night following the night defendant was arrested and taken to the police station and asked what he knew about Carter. This was at midnight. He was released after the questioning.

Jim Curry, the county surveyor, was called to testify concerning the distance from the apartment allegedly entered by the defendant to his home, stating that it was 530 feet from the back door at 715 South Third Street to the front door at 415 West Southside Boulevard. He stated that the defendant lived on the Boulevard.

The question of the distance between the home of prosecutrix and that of defendant, and the question of whether, if defendant entered the home, he might have taken a circuitous route to reach his home in the few minutes time elapsing between the exit from the house and the appearance of the officers on the West Southside Boule-

vard were all matters to be solved by the jury.

Counsel for the defendant argues that the officers should have attempted to find footprints leading from the back door and determined if defendant's shoes would fit in such prints, and argues that the prints in the dew-covered grass would have had a bearing. All this may be true. But, again, all the questions raised were proper arguments before the jury, and were no doubt advanced.

■ The witness who positively identified the defendant was corroborated in a number of respects, and diligent cross-examination did not produce deviation or any indication of being incapable of receiving just impressions. Tit. 12 O.S.A. § 385, subd. 2. The record does not disclose at any place where it was contended that Darlene Hensley was not competent to testify. It is merely argued in the brief that her story was fantastic and insufficient as to identification to support the judgment. As stated in Rawls v. State, 93 Okl.Cr. 219, 226 P.2d 984, cited by counsel for defendant: "Competency of child is to be determined by degree of understanding that the child appears to possess, and not by the age of the child."

■■ Standing uncontradicted, it is determined that the evidence was sufficient to support the verdict, and the judgment entered, based thereon. We have often stated that where the evidence of the State is sufficient to support the conviction and the defendant offers no evidence to contradict the same, the judgment and sentence will be affirmed where the same conforms to the provisions of the law. Owens v. State, 93 Okl.Cr. 22, 224 P.2d 612.

The judgment appealed from is affirmed.

JONES, P. J., and BRETT, J., concur.